THE UPJOHN COMPANY v NEW HAMPSHIRE
INSURANCE COMPANY

Docket Nos. 86906-86908. Argued January 10, 1991 (Calendar No. 9).
Decided August 26, 1991. Rehearing denied 439 Mich 1202.

The Upjohn Company brought an action in the Oakland Circuit
Court against New Hampshire Insurance Company, Allstate
Insurance Company, and others, alleging coverage under vari-
ous policies for damages and expenses arising out of the leaking
of toxins from an underground storage tank. The court, Steven
Andrews, J., granted summary disposition for the plaintiff, and
held with regard to Allstate that coverage was not precluded by
the pollution-exclusion clause of its policy. The Court of Ap-
peals, GILLIS, P.J., and SHEPHERD and SAWYER, JJ., affirmed in
an opinion per curiam, holding that even a continuous dis-
charge of chemicals may be both sudden and accidental and
outside the pollution exclusion (Docket Nos. 98969, 99012,
99145). Allstate appeals.

In an opinion by Justice RILEY, joined by Justices BOYLE,
GRIFFIN, and MALLETT, the Supreme Court held:

The phrase "sudden and accidental" as used in the policy at
issue is unambiguous; "sudden" includes a temporal element as
well as a sense of the unexpected, and "accidental" means
unexpected and unintended. Thus, the pollution-exclusion
clause applies as a matter of law, and the plaintiff is not
entitled to coverage.

1. The pollution exclusion in Allstate's policy does not apply
to sudden and accidental releases of toxic chemicals. To deter-
mine whether an exclusion applies, it must be determined
whether the policy is clear and unambiguous on its face.
Ambiguity cannot be created where none exists, and the terms
of a contract must be enforced as written. The pollution exclu-
sion is not ambiguous. Understood in its plain and easily
understood sense, "sudden" includes a temporal element that
joins conceptually the immediate and the unexpected; "acciden-
tal" means occurring unexpectedly and unintentionally, by
chance.

2. Under the facts of this case, the release of material from
the storage tank could not possibly be considered sudden be-
cause the release was not unexpected. As a matter of law, the

plaintiff had sufficient information available to it to expect that a chemical by-product was escaping from a leak in the storage tank and that the release would continue until use of the tank was stopped. The combined knowledge of employees may be imputed to a corporation. Thus, Upjohn had sufficient information available to it through its various employees and through its records to permit the finding that the release of chemical by-product from the storage tank was expected by it. Because the release of the chemical by-product was not unexpected, and, as a matter of law, it was not sudden and accidental, the pollution-exclusion clause applies, precluding coverage.

Reversed.

Chief Justice CAVANAGH, joined by Justice BRICKLEY, concurring in part and dissenting in part, stated that the grant of summary disposition in this case was inappropriate because it was not possible to determine, as a matter of law, at that point in the proceedings, that the underground leak could not possibly have been sudden. Whether the leak occurred gradually or suddenly upon the first day's influx of by-product is a question of fact. The lapse of time between the beginning of the leak and the discovery of the leak is not determinative of the question whether the leak was sudden or accidental and is irrelevant with regard to the suddenness of the discharge. There should be a determination whether all the holes in the tank gave way at once, producing a sudden discharge, rather than focusing on the length of time that elapsed before discovery of the leak. The case should be remanded for a factual determination regarding the sudden and accidental nature of the leak.

Justice LEVIN, dissenting, stated the phrase "sudden and accidental" is ambiguous, and in this case means "unexpected and unintended."

The terms of the pollution exclusion, in particular the phrase "sudden and accidental," may be interpreted in more than one way by reasonable laypersons. An insurance policy term is ambiguous when it is susceptible to more than one reasonable definition, assessed from a layperson's point of view. In the presence of two such interpretations, only one of which results in liability to the insurer, the policy is to be read to provide rather than exclude coverage. When a policy term is ambiguous, courts may look to extrinsic evidence of the meaning of the terms, in this case, the drafting history of the pollution-exclusion clause, which supports the plaintiff's claim of coverage.

Once the phrase "sudden and accidental" is found to be reasonably susceptible of more than one meaning, it is ambigu-

ous as a matter of law, and the ambiguity is resolved in favor of the insured: the exception of the pollution clause, intended by its drafters as a restatement of occurrence, covers unexpected or unintended damage or results. Taken as a whole, the pollution-exclusion clause and exception provides coverage only when the insured intentionally or recklessly causes injury or damage. Knowledge of raw data regarding tank levels cannot be imputed to the plaintiff until analyzed and known by a person at the appropriate level of corporate responsibility. Whether the routine procedures in which the tank's fluid level were audited were appropriate or adequate is a question of reasonableness under the circumstances and one of fact, not law.

178 Mich App 706; 444 NW2d 813 (1989) reversed.

*Denenberg, Tuffley, Bocan, Jamieson, Black, Hopkins & Ewald, P.C.* (by *Julius Denenberg, William G. Jamieson, George F. Curran, III,* and *Dana L. Ramsay*), for plaintiff The Upjohn Company.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *Thomas W. Emery*); (*Philip J. McGuire,* of counsel), for defendant Allstate/NESCO.

Amici Curiae:

*Hooper, Hathaway, Price, Beuche & Wallace* (by *Bruce T. Wallace*); (*Wiley, Rein & Fielding,* by *Thomas W. Brunner, Laura A. Foggan,* and *Robert R. Lawrence,* of counsel) for Insurance Environmental Litigation Association.

*John D. Noonan* (*Andrew P. Buchsbaum,* of counsel) for Environmental Law Society, University of Michigan, Michigan Environmental Council and Public Interest Research Group in Michigan.

*Dykema, Gossett* (by *Roger K. Timm, Stephen D. Turner,* and *John A. Ferroli*) for South Macomb Disposal Authority.

*Honigman, Miller, Schwartz & Cohn* (by *Philip
A. Grashoff*); (*Covington & Burling,* by *William H.
Allen, William F. Greaney,* and *Dorothy C. Mitchell,* of counsel) for Dow Chemical Company, Product Liability Advisory Council, American Fiber
Manufacturers Association, American Petroleum
Institute, Chemical Manufacturers Association,
E. I. DuPont de Nemours & Company, International Business Machines Corporation, and Olin
Corporation.

*Rosi, Olson & Levine, P.C.* (by *James M. Olson*
and *Barry L. Levine*), for Jan and Sandra Doyen
doing business as Carefree Cove Resort, and Robert L. Johnson.

*Honigman, Miller, Schwartz & Cohn* (by *Jay E.
Brant, Philip A. Grashoff, Jr., Mark A. Goldsmith,*
and *Daniel G. Helton*) for Arco Industries Corporation, Bronson Plating Company, Hitachi Magnetics
Corporation, Rengo Oil Company, Thomas Solvent
Company, and Thermofil, Inc.

*Hill, Lewis* (by *Richard C. Sanders*); (*Anderson,
Kill, Olick & Oshinsky, P.C.,* by *Eugene R. Anderson, Kevin J. O'Brien,* and *Bruce A. Brown,* of
counsel), *Martha A. Churchill,* General Counsel,
Mid-America Legal Foundation (*Varnum, Riddering, Schmidt & Howlett,* by *Matthew W. Zimmerman, Mark S. Allard* and *Rosi, Olson & Levine,* by
*Barry Levine,* of counsel), for the Budd Company,
the City of Clare, the City of Evart, Harrow Products, Inc., Mid-America Legal Foundation, and
Traverse City Light and Power.

RILEY, J. In this case, we are asked to interpret
and apply the pollution-exclusion clause found in
the comprehensive general liability policy of All-

state Insurance Company.[1] The resolution of this issue requires us to answer two questions: (1) is the phrase "sudden and accidental" which appears in the pollution-exclusion clause and which creates an exception to the exclusion, unambiguous, and (2), if unambiguous, what is the proper meaning of the phrase "sudden and accidental."

We hold that the phrase "sudden and accidental" is unambiguous. Furthermore, we find that the definition of "sudden" includes a temporal element as well as a sense of the unexpected, and that "accidental" means unexpected and unintended.

We, therefore, find that the Court of Appeals erred in holding that the pollution-exclusion clause did not apply under the facts of this case. Accordingly, we reverse the decision of the Court of Appeals and find, as a matter of law, that the pollution-exclusion clause applies and, therefore, plaintiff, The Upjohn Company, is not entitled to coverage under defendant Allstate's policy.

### I. FACTS AND PROCEEDINGS

On August 13, 1982, The Upjohn Manufacturing Company (UMC), a Puerto Rico-based division of The Upjohn Company, began its annual production of clindamycin, an antibiotic. Two toxic by-products were produced in the clindamycin campaign. These chemicals were pumped into an underground storage tank designated FA-129 which had a ten thousand gallon capacity.

---

[1] The Allstate Insurance Company asked this Court to consider three other issues along with the pollution exclusion. These issues were as follows: (1) whether there was an "occurrence" under the policy; (2) whether recovery costs are "damages"; and (3) whether an "other insurance" clause in the policy was applicable. However, this Court limited the scope of the granted issues to the interpretation and application of the pollution-exclusion clause by an order dated December 27, 1990.

Each weekday of the year, an Upjohn employee measured the level of by-product in the tank. The employee recorded the measurement on a tank farm inventory sheet and turned the sheet over to his supervisor. Each day's sheet was reviewed, and compared with previous days' sheets which were kept on file at the UMC facility. This was Upjohn's standard procedure.

Prior to August 16, 1982, the tank-level measurements remained constant at ten inches or 475 gallons. However, on August 16, 1982, the same day that Upjohn had pumped its first batch of approximately seventeen hundred gallons of the by-product into tank FA-129, the tank-level measurement read three inches or eighty gallons. Despite this discrepancy in the tank-level measurement, Upjohn continued, over the next few weeks, to pump eight more batches of by-product into tank FA-129. Approximately seventeen hundred gallons of by-product were added to tank FA-129 on each of the following days: August 18, 19, 24, 25, 26, 30 and 31, and on September 1, 1982. The daily tank measurement readings continued to show levels which did not coincide with the amount of by-product which was pumped into tank FA-129.[2]

---

[2] The data from the tank-level measurements were as follows:

FA 129 TANK LEVEL INVENTORY

| DATE | LEVEL | GALLONS |
| --- | --- | --- |
| Aug. 9 | 10 | 475 |
| 10 | 10 | 475 |
| 11 | 10 | 475 |
| 12 | 10 | 475 |
| 13 | 10 | 475 |
| 14 | — | — |
| 15 | — | — |

On September 3, 1982, Upjohn completed its monthly audit of the tank-level inventory records. Since the tank-level measurements did not coincide with what was intended to be in tank FA-129, no additional quantities of the by-product were pumped into the tank.

It was determined that tank FA-129 had three holes in it due to corrosion. Upjohn estimated that approximately fifteen thousand gallons of the toxic by-product leaked from the tank since the first batch of by-product was pumped into tank FA-129.

| DATE | | LEVEL | GALLONS |
|---|---|---|---|
| Aug. | 16 | 3 | 80* |
| | 17 | 11.5 | 585 |
| | 18 | 11.5 | 585 |
| | 19 | 10.5 | 511 |
| | 20 | 16 | 945 |
| | 21 | — | — |
| | 22 | — | — |
| Aug. | 23 | 8 | 342 |
| | 24 | 8 | 342 |
| | 25 | 10.5 | 511 |
| | 26 | 8 | 342 |
| | 27 | 8 | 342 |
| | 28 | — | — |
| | 29 | — | — |
| Aug. | 30 | 8.5 | 375 |
| | 31 | 15.5 | 903 |
| Sept. | 1 | 25 | 1,794 |
| | 2 | 18.5 | 1,167 |
| | 3 | 10.5 | 511 |
| | 4 | — | — |
| | 5 | — | — |
| Sept. | 6 | — | — |
| | 7 | 7.5 | 312 |
| | 8 | 25 | 1,794** |
| | 9 | — | — |
| | 10 | — | — |

*First Distillate Received
**Partially Filled [With] Water for Washing

On January 11, 1985, Upjohn[3] filed suit against defendant Allstate Insurance Company,[4] claiming that Upjohn was covered under Allstate's comprehensive general liability policy for damages and expenses arising out of the leaking underground storage tank FA-129.

On September 24, 1986, Upjohn moved for summary disposition. The court held that there was coverage under the policy and that coverage was not precluded by the pollution-exclusion clause contained in the policy. The Court, therefore, granted Upjohn's motion for summary disposition.

The Court of Appeals affirmed the trial court's grant of summary disposition. Relying on the definition of "sudden and accidental" as stated in *Jonesville Products, Inc v Transamerica Ins Group,* 156 Mich App 508, 512; 402 NW2d 46 (1986), the Court held that "even a continuous discharge of chemicals may be both accidental (i.e., unintended) and sudden (i.e., unexpected) and, therefore, outside the pollution exclusion." The Court held that the trial court properly concluded that there was no genuine issue of material fact that the leak was "sudden and accidental." *Upjohn Co v New Hampshire Ins Co,* 178 Mich App 706, 716; 444 NW2d 813 (1989).

On July 13, 1990, this Court granted Allstate's leave to appeal and ordered that it be consolidated with *Polkow v Citizens Ins Co of America* and *Protective Nat'l Ins Co of Omaha v City of Woodhaven.*[5]

## II. ANALYSIS

The Allstate Comprehensive General Liability

---

[3] Upjohn commenced this action, along with subrogated property insurers who are no longer parties in this action.

[4] Upjohn also brought suit against several other liability insurers who are no longer parties in this action.

[5] 435 Mich 862 (1990).

Policy is subject to several exclusions which limit the broad coverage otherwise provided under the policy.[6] The policy's pollution exclusion provides:

---

[6] Justice LEVIN, in his dissent, argues that the drafting history of the pollution-exclusion clause supports the proposition that the exclusion does not limit coverage otherwise provided under the policy, but instead, merely clarifies existing coverage. Justice LEVIN states that "when a policy term is ambiguous, courts may look to extrinsic evidence of the term's meaning. In this case, the extrinsic evidence— the drafting history of the pollution-exclusion clause—supports Upjohn's claim for coverage under the CGL policy." *Post*, pp 224-225. Furthermore, Justice LEVIN states:

> Courts that find the phrase "sudden and accidental" to be reasonably susceptible to different meanings, and therefore ambiguous, generally turn to the well-documented drafting and marketing history of the CGL's pollution exclusion. By and large, those courts finding that the phrase is unambiguous do not address this history, even to the extent of acknowledging its existence.[27]

---

[27] But see *Lumbermens Mutual Casualty Co v Belleville Industries, Inc*, 407 Mass 675, 682; 555 NE2d 568 (1990), where the Massachusetts Supreme Court found that the term "sudden" unambiguously carries a temporal component. Only after finding the term unambiguous did the court state that "[b]ecause the word 'sudden' in the pollution exclusion clause is not ambiguous, we have no need to consider the drafting history of that clause or any statements made by insurance company representatives concerning the intention of its drafters."

---

[*Post*, p 228.]

First, Justice LEVIN cites the rule that "when a policy term is ambiguous, courts may look to extrinsic evidence of the term's meaning," but then he condemns the majority for following the same rule. Indeed, as Justice BOYLE stated in *Allstate Ins Co v Freeman*, 432 Mich 656, 712; 443 NW2d 734 (1989), when the policy is found to be clear and unambiguous "there is no need to resort to extrinsic evidence to ascertain the meaning of the exclusion. [See 2 Couch, Insurance, 2d (rev ed), § 15:57, pp 298-302.] (Since all prior negotiations are assumed to be merged in the written contract, the policy itself constitutes the contract between the parties, and, if the meaning is clear, it alone must be looked to in construction.)"

The majority is in accord with Justice BOYLE's analysis and thus we do not look to the drafting history when interpreting and applying the policy terms.

Notwithstanding the above, the majority rejects Justice LEVIN's

This policy shall not apply:—

\* \* \*

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gaseous waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The pollution exclusion does not apply to releases which are "sudden and accidental." The question presented in this case is whether the release of the chemical by-product from tank FA-129 was "sudden and accidental," and, therefore, whether the pollution-exclusion clause applies, thus, precluding coverage under the policy.

"Initially, in determining whether a policy applies, we first must determine whether the policy is clear and unambiguous on its face." *Metropolitan Property & Liability Ins Co v DiCicco,* 432 Mich 656, 665; 443 NW2d 734 (1989) (opinion of RILEY, C.J.). We cannot create an ambiguity where none exists. *Edgar's Warehouse, Inc v United*

interpretation of the drafting history. Justice LEVIN uses selected portions of the drafting history to support his conclusion that the pollution-exclusion clause was intended merely as a clarification of existing coverage. *Post,* pp 230-231. Furthermore, the majority refuses to treat the occurrence language and the pollution-exclusion clause as interchangeable. When reading the policy as a whole, it is clear that the two clauses have a natural and separate focus. See *Polkow v Citizens Ins Co of America,* 438 Mich 174; 476 NW2d 382 (1991). We disagree with the assertion that the pollution-exclusion clause simply clarified the definition of an "occurrence" in the coverage section of the policy. Simply stated, it is our belief that exclusions exclude. See *American Motorists Ins Co v General Host Corp,* 667 F Supp 1423, 1429 (D Kan, 1987) ("[i]t is not a novel idea that exceptions to a broad blanket of coverage can be made"); *Weedo v Stone-E-Brick, Inc,* 81 NJ 233, 237; 405 A2d 788 (1979) (the function of an exclusion "is to restrict and shape the coverage otherwise afforded"). See also *Raska v Farm Bureau Mutual Ins Co,* 412 Mich 355, 363; 314 NW2d 440 (1982).

*States Fidelity & Guaranty Co,* 375 Mich 598; 134 NW2d 746 (1965). Similarly, we reject the temptation to rewrite the plain and unambiguous meaning of the policy under the guise of interpretation. Rather, we enforce the terms of the contract as written. *Eghotz v Creech,* 365 Mich 527, 530; 113 NW2d 815 (1962). If the language of the policy is unambiguous, it must be considered "in its plain and easily understood sense." 432 Mich 710. See *Wertman v Michigan Mutual Liability Co,* 267 Mich 508, 510; 255 NW 418 (1934).

We find persuasive the recent opinions of the United States Court of Appeals for the Sixth Circuit which find the terms of the pollution exclusion to be unambiguous. *United States Fidelity & Guaranty Co v Star Fire Coals, Inc,* 856 F2d 31 (CA 6, 1988); *United States Fidelity & Guaranty Co v Murray Ohio Mfg Co,* 875 F2d 868 (CA 6, 1989); *FL Aerospace v Aetna Casualty & Surety Co,* 897 F2d 214 (CA 6, 1990).[7]

We conclude that when considered in its plain and easily understood sense, "sudden" is defined with a "temporal element that joins together conceptually the immediate and the unexpected." *Star Fire Coals, supra* at 34. The common, everyday understanding of the term "sudden" is " 'happening, coming, made or done quickly, without warning or unexpectedly; abrupt.' " *FL Aerospace, supra* at 219. "Accidental" means "[o]ccurring unexpectedly and unintentionally; by

[7] In his dissent, Justice LEVIN criticizes the majority for failing to further analyze the question of ambiguity. *Post,* p 223. However, the three cases cited in support of the majority's conclusion that the terms of the pollution exclusion are unambiguous provide the reasoning, rationale, and analysis which the majority finds persuasive. Therefore, in citing those cases, we refer the reader of the majority opinion to the analysis in those cases. "Nothing would be gained by restating here what has been persuasively stated there." *New Hampshire Ins Co v H Brown Co,* unpublished opinion of the Kent Circuit Court, decided September 27, 1989 (Docket No. 87-56314-CK), p 11.

chance." *The American Heritage Dictionary: Second College Edition,* p 72. We, therefore, reject the definition of "sudden and accidental" as set forth by the Michigan Court of Appeals in *Jonesville.* Thus, we find that the terms "sudden" and "accidental" used in the pollution-exclusion clause are unambiguous.[8]

---

[8] Justice LEVIN, in his dissent, argues that the phrase "sudden and accidental" is susceptible to more than one reasonable interpretation or meaning. Further, he states that this being so, the phrase is ambiguous, as a matter of law, and that "[s]uch ambiguity is resolved in favor of the insured . . . ." *Post,* pp 224, 232.

Justice LEVIN, like those courts which find that the terms of the pollution-exclusion clause are ambiguous, relies heavily on an assertion of ambiguity buttressed by citation to the contract construction principle which construes ambiguous language in favor of the insured. The majority concludes, however, that the terms of the pollution-exclusion clause are unambiguous. See cases cited *ante,* p 206. Furthermore, in response to Justice LEVIN's claim that ambiguity exists, and his reliance on rules of contract construction for such proposition, the majority cites *Wozniak v John Hancock Mutual Life Ins Co,* 288 Mich 612, 615; 286 NW 99 (1939), which states:

> "An insurance policy is a contract and should be interpreted according to its plain meaning. The court is mindful of the rule of law that where the provisions of an insurance policy are uncertain or ambiguous, or the meaning is not clear, that those terms should be given such interpretation or construction as is most favorable to the insured. This rule does not mean, however, that the plain meaning of plain words should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefiting the insured."

See also *Smith v Lumbermen's Mutual Ins Co,* 101 Mich App 78, 83; 300 NW2d 457 (1980) ("[a] patently unreasonable interpretation of a contractual ambiguity will not be employed merely to allow the insured to recover his losses").

Justice LEVIN, in his dissent, attempts to support his assertion of ambiguity in two ways. First, he claims that the term "sudden" is ambiguous because it is defined in a variety of ways in the dictionary (*post,* pp 227-228) and is thus susceptible to more than one reasonable interpretation. The dissent cites *Just v Land Reclamation, Ltd,* 155 Wis 2d 737; 456 NW2d 570 (1990), in support of this claim. The *Just* court held that "[t]he very fact that recognized dictionaries differ on the primary definition of 'sudden' is evidence in and of itself that the term is ambiguous." *Id.* at 745.

We reject the reasoning of the *Just* court. Most, if not all, words are defined in a variety of ways in each particular dictionary, as well as

Having concluded that the phrase "sudden and accidental" is not ambiguous, we now turn to the proper application of the pollution-exclusion clause.

Under the facts of this case, we conclude that the release of material from tank FA-129 could not possibly be considered "sudden" because the release of by-product from tank FA-129 was not unexpected by Upjohn.[9]

being defined differently in different dictionaries. Similarly, different dictionaries have different ways of listing and ordering the several definitions of each particular word. If courts followed the reasoning of the *Just* court, it would be virtually impossible to write a contract that was unambiguous. Moreover, the majority refuses to ascribe ambiguity to words in the English language simply because dictionary publishers are obliged to define words differently to avoid possible plagiarism. Therefore, we reject the temptation to rewrite the plain and unambiguous meaning of the policy under the guise of interpretation. Rather, we enforce the terms of the contract as written. *Eghotz v Creech*, 365 Mich 527, 530; 113 NW2d 815 (1962).

Second, Justice LEVIN claims that the fact that there has been "[s]uch profound disagreement among courts over the construction of the same phrase in standard-form insurance policies itself is evidence of ambiguity." *Post*, p 227. Although this serves as a convenient argument for those who support a finding of ambiguity, in our view it merely begs the question.

[9] Justice LEVIN, in his dissent, criticizes as inconsistent the majority's focus on the expectancy component of the word "sudden" when applying the pollution-exclusion clause in this particular case. Justice LEVIN states:

> The majority determines that the phrase "sudden and accidental" is unambiguous and properly means "happening quickly and unexpectedly." It then proceeds to review the evidence. However, rather than relying on the definition it has just adopted, the majority uses the definition that plaintiff Upjohn argues is appropriate, i.e., that "sudden and accidental" means "*unexpected* and unintended."
>
> The majority holds that the release of toxic material at issue "could not possibly be considered 'sudden' because the release of by-product from tank FA-129 was not unexpected by Upjohn." The majority thus resolves the issue solely on the basis of the "unexpected" component of the term "sudden," despite its determination, following [*Star Fire, supra*], that "sudden" could not be defined without reference to its temporal component. [*Post,* p 232. Emphasis in original.]

Each weekday of the year, tank-level measurements were taken by an Upjohn employee for all the tanks in the tank farm. The employee used a calibrated stick to measure the level of material in each tank. The employee then recorded the measurement of each tank on the tank farm inventory sheet for that day. This sheet was then turned into the employee's supervisor. Each day's sheet was reviewed and compared with previous days' sheets which were kept on file at the UMC facility. UMC has record retention schedules on all such information. These tank-level measurements were taken to determine what the level of material was in each tank and, thus, when each tank was full and needed to be emptied for disposal purposes. Such information indicated when a tank was too full to allow another batch of material to be pumped into it.

Prior to August 16, 1982, the daily tank-level measurements for tank FA-129 remained constant at ten inches or 475 gallons. This is consistent with the fact that when tank FA-129 was not being

Justice LEVIN misreads the majority opinion and thus his argument fails. The majority does not determine that *the phrase* "sudden and accidental" means "happening quickly and unexpectedly." The majority determines that *the word* "sudden," when considered in its plain and easily understood sense, "is defined with a 'temporal element that *joins together* conceptually the immediate *and* the unexpected.'" See *ante*, p 207. Therefore, Justice LEVIN is clearly wrong in stating that "rather than relying on the definition it has just adopted, the majority uses the definition that plaintiff Upjohn argues is appropriate, i.e., that 'sudden and accidental' means '*unexpected* and unintended.'" *Post*, p 232 (emphasis in original).

Furthermore, Justice LEVIN's argument that the majority, by focusing on the expectancy component of the definition of the word sudden, is being inconsistent with its own determination of what sudden means is without merit. The majority states that "sudden" is defined with a temporal element that joins together conceptually the immediate *and* the unexpected. Under this definition, for something to be sudden, it must be *both* immediate *and* unexpected. Since, under the facts of this case, the release of by-product was not unexpected by Upjohn, it is consistent for the majority to state that the release cannot possibly be viewed as "sudden."

actively used, as was the case before August 16, 1982, there is an accumulation of ten inches of material or 475 gallons in the tank because that is about all that is capable of being pumped out of the tank. On August 16, 1982, the same day that the first batch of seventeen hundred gallons of by-product was received, the tank-level measurement was three inches or eighty gallons. Despite this discrepancy, Upjohn continued its production of clindamycin and added eight more batches, approximately 13,600 gallons, of the by-product to the ten thousand gallon tank. The tank level measurements taken from August 16, 1982, until early September 1982, when tank FA-129 was removed from active use, reflected that there was an unaccounted loss of the by-product.

In early September 1982, after a monthly audit of tank levels by Upjohn indicated that there was a leak in tank FA-129, no additional quantities of the by-product were pumped into the tank. It was later determined that the discrepancies in the tank-level readings were due to several holes in tank FA-129 which caused the tank to continuously leak chemicals into the ground from August 16, 1982, through September 7, 1982. Upjohn states that anywhere from twelve thousand gallons to eighteen thousand gallons of by-product leaked from tank FA-129 during the period.

Upjohn claims that although the tank level measurements for tank FA-129 were unusually low on August 16, 1982, and although a large discrepancy continued to exist in the measurements that were taken, recorded, and reviewed by Upjohn employees, Upjohn did not have enough information to expect that the chemical by-product that was in the tank and was continuously being added to the tank was escaping from a leak in the tank. Upjohn claims that they did not expect that there

was a release of the by-product from tank FA-129 until a monthly audit of tank levels that was completed in early September 1982 indicated a leak. During this audit all the previously recorded and reviewed tank farm inventory sheets were reviewed by Upjohn's accounting people. It is Upjohn's contention that only after all relevant figures were compared, that UMC could even have expected that by-product was missing from Upjohn's production and storage system. Upjohn claims that the unusually low tank-level measurement for tank FA-129 taken on August 16, 1982, did not lead them to expect that chemical by-product was escaping from the tank because reduced tank levels did not themselves indicate a leak in the tank. Upjohn claims that the by-product could have been accidentally or intentionally diverted to other tanks, production could have been interrupted, or materials could have been intentionally removed from the tank for disposal.

Upjohn's claims cannot be reasonably supported by the record in this case. Although reduced tank levels may not themselves indicate a leak in tank FA-129, the fact that the tank level on August 16, 1982, measured three inches or eighty gallons precludes this Court from finding anything other than that Upjohn must have expected a leak in tank FA-129. Thus, we find, as a matter of law, that the Upjohn Company had sufficient information available to it on August 16, 1982, to expect that a chemical by-product was escaping from a leak in tank FA-129.[10] Furthermore, we find that Upjohn

[10] The record in this case is undisputed that when the tank is not in use, there is an accumulation of ten inches or 475 gallons of by-product in the tank because that is about all that is capable of being pumped out of the tank. In essence, even when the tank is empty, there should be 475 gallons of by-product in it. In fact, the record shows that prior to August 16, 1982, the tank-level measurements for tank FA-129 were constant at ten inches or 475 gallons.

had sufficient information available to it to expect that such release of the by-product was occurring and would continue to occur until they stopped using the tank.[11]

In determining the knowledge attributable to a company, the court in *United States v TIME-DC, Inc,* 381 F Supp 730, 738 (WD Va, 1974), held:

A corporation can only act through its employees and, consequently, the acts of its employees, within the scope of their employment, constitute the acts of the corporation. Likewise, knowledge acquired by employees within the scope of their employment is imputed to the corporation. In consequence, a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, the corporation is considered to have acquired the collective knowl-

---

[11] Upjohn claims that the unusually low tank-level measurement for tank FA-129 taken on August 16, 1982, did not lead it to expect that chemical by-product was escaping from the tank because reduced tank levels did not themselves indicate a leak in the tank. Upjohn claims that the by-product could have been accidentally or intentionally diverted to other tanks, production could have been interrupted, or materials could have been intentionally removed from the tank for disposal.

However, it is clear from the undisputed facts of this case that none of these claims can be reasonably upheld. A tank-level measurement of three inches or eighty gallons would not indicate an accidental or intentional diversion of by-product to another tank because if the by-product was diverted and did not reach tank FA-129, then the tank-level measurement on August 16, 1982, should still have read at least ten inches or 475 gallons. The same rationale holds true for the claim by Upjohn that production of the by-product could have been interrupted. With respect to the claim by Upjohn that the three-inch or eighty-gallon tank-level measurement could have indicated that materials could have been intentionally removed from the tank for disposal, this was not possible because the record states that even when the tank is not in use, there is an accumulation of ten inches or 475 gallons in the tank.

Therefore, the only reasonable conclusion that can be drawn from the facts presented in the record in this case is that Upjohn must have expected that chemical by-product was escaping from tank FA-129 as early as August 16, 1982.

edge of its employees and is held responsible for their failure to act accordingly.

The Michigan Court of Appeals adopted this reasoning in *People v American Medical Centers of Michigan, Ltd,* 118 Mich App 135; 324 NW2d 782 (1982).

In *Gordon Sel-Way, Inc v Spence Bros, Inc,* 177 Mich App 116, 124; 440 NW2d 907 (1989),[12] the Court recognized that "the combined knowledge of employees may be imputed to a corporation" and stated:

> We agree with this rule and adopt the standard for imputed collective knowledge set forth in *Copeman Laboratories Co v General Motors Corp,* 36 F Supp 755, 762 (ED Mich, 1941):
> "When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person pursuant thereto is in the knowledge of the corporation. The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority." [*Id.* at 124-125.]

We adopt this reasoning and apply it in this case. This Court concludes that the Upjohn Company had sufficient information available to it, through its various employees and through its records kept at the UMC facility, to allow us to find, as a matter of law, that the release of chemi-

---

[12] This case is currently on appeal before this Court on a different issue.

cal by-product from tank FA-129 was expected by
the Upjohn Company.[13]

### III. CONCLUSION

In summary, under the imputed-collective-
knowledge standard the Upjohn Company cannot
claim that it did not expect on August 16, 1982,
and every day thereafter, the release of by-product
from tank FA-129. Furthermore, we reject Upjohn's
assertion that the information obtained by several
of its employees was not acquired by any individ-
ual employee who then would have comprehended
its full import, and that only after a monthly audit
of the same information could it have expected the
release.[14] Rather, the Upjohn Company is consid-

[13] Justice LEVIN, in his dissent, claims that the majority "fails to
distinguish between raw data and 'knowledge.'" *Post,* p 233. He
states that only on September 3, 1982, did Upjohn determine that a
leak occurred. *Id.,* p 234. He states that "the majority errs in finding
that Upjohn *must have known* on the first day of the clindamycin
manufacturing campaign that tank FA-129 was leaking. What Upjohn
possessed between August 16 and September 13, 1982, was raw,
unanalyzed data, *not* knowledge." *Id.*

The majority concludes that Justice LEVIN fails to distinguish
between "knowledge" and "expectancy." The majority never finds
that Upjohn must have known on August 16 that the tank, in fact,
was leaking. Rather, the majority finds that Upjohn had sufficient
information available to it, through its various employees, to allow
this Court, upon applying the imputed-collective-knowledge standard,
to find, as a matter of law, that Upjohn must have *expected* the leak
in tank FA-129. See, *supra,* ns 10-11 and accompanying text. The
knowledge required to expect something is less than knowledge
required to know the same thing. This is a distinction that Justice
LEVIN fails to see. The majority need not find that Upjohn *knew* of
the leak on August 16, 1982, to find that, as a matter of law, the
release of chemical by-product was not "sudden and accidental," the
majority need only find that the facts are undisputed that Upjohn
*expected* the leak on August 16, 1982. The term "sudden" has been
defined by the majority (see *ante,* p 207) as well as by Justice LEVIN
in his dissent (see *post,* p 221) as having an "expectancy" component
and not a "knowledge" component.

[14] Justice LEVIN, in his dissent, would like to limit the imputed-
collective-knowledge standard by holding that it is only applicable to
information possessed by "employees *at the appropriate level of
responsibility* . . . ." *Post,* p 234. Justice LEVIN attempts to support

ered to have acquired the collective knowledge of its employees, the same collective knowledge which the monthly audit revealed was available to Upjohn as early as August 16, 1982. Therefore, Upjohn must be held to have expected the release of by-product from tank FA-129 as early as August 16, 1982.

Since the release of chemical by-product was not unexpected, as a matter of law it cannot be "sudden and accidental."[15] Therefore, the pollution-

his limitation for so-called "appropriate" employees by citing *Gordon, supra,* which stated that "one of the burdens attendant upon the corporate form is that the law imputes the knowledge of individual *officers and employees at a certain level of responsibility* to the corporation." *Id.,* p 233. (Emphasis added.) He adds that "[t]his principle speaks to persons *representing a corporation* who, acting in the scope of their employment and authority, learn or do something on behalf of the corporation." *Id.,* pp 233-234.

After acknowledging that the employees to which the imputed-collected-knowledge standard applies are simply those employees acting in the scope of their employment and authority and who learn or do something on behalf of the corporation, Justice LEVIN attempts to limit the scope of the standard to apply only to Upjohn's auditors or officers. This is completely in conflict with the purpose behind the standard (cf. *Upjohn Co v United States,* 449 US 383; 101 S Ct 677; 66 L Ed 2d 584 [1981]) and would allow the Upjohn Corporation to "'plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import'" (see *ante,* p 213) —something the cases cited by the majority clearly reject as the antithesis of imputed collective corporate knowledge.

The cases which endorse the imputed-collected-knowledge standard stand for the proposition that a corporation is deemed to have had knowledge of information if the means were present by which the company could have detected such information. *United States v TIME-DC, Inc,* 381 F Supp 730, 739 (WD Va, 1974). Obviously, such means were present in the case before this Court, through Upjohn's various employees and through its records kept at the UMC facility to detect information which would lead Upjohn to, at the very least, expect that tank FA-129 was leaking. "In some cases such an analysis may appear harsh, but doing business in the corporate form carries certain burdens of which this is one." *Gordon, supra* at 126.

[15] Chief Justice CAVANAGH, dissenting, argues that "having defined 'sudden' to have a temporal element, it would seem prudent to determine the quickness with which this leak occurred." *Post,* p 218. He states that if the leak developed quickly it could be declared "sudden." *Id.* However, a leak, even if it developed quickly, could not be declared "sudden" if it were not also unexpected. Under the

exclusion clause does apply, and the Upjohn Company is not entitled to coverage under the Allstate Insurance Company policy. Accordingly, we reverse the decision of the Court of Appeals.

BOYLE, GRIFFIN, and MALLETT, JJ., concurred with RILEY, J.

CAVANAGH, C.J. (*concurring in part and dissenting in part*). I agree with the majority that the phrase "sudden and accidental" contained in the exception to the pollution exclusion clause is unambiguous. I also agree that the word "sudden" includes a temporal element. I write separately because the grant of summary disposition in this case was inappropriate and because I am not convinced that this leak could not possibly, as a matter of law, have been sudden. Whether the underground leak occurred gradually or "suddenly" upon the first day's influx of by-product is a question of fact, and the case should be remanded to allow the lower court to apply the definition developed by this Court.

The lead opinion declares that the release "could not possibly be considered 'sudden' because the release of by-product from tank FA-129 was not

majority's definition of sudden, with which Chief Justice CAVANAGH agrees, a leak must be *both* quick *and* unexpected. See n 9. Therefore, it is not *necessary*, as Chief Justice CAVANAGH suggests, to determine the quickness with which a leak occurred when it has been determined, as in the majority, that the leak was not unexpected.

Chief Justice CAVANAGH, however, believes that there is a genuine issue of material fact regarding whether the leak was expected by Upjohn. Chief Justice CAVANAGH argues that the majority relies on comparisons of daily tank farm inventory sheets to show that Upjohn had the information sufficient to expect a leak. *Id.* Such an argument misreads the majority's application of the facts in this case. Indeed, the majority insists that the tank level reading on August 16 alone was enough to provide the necessary information to the Upjohn Company, to allow this Court to find that Upjohn expected the leak. See *ante,* p 212. Therefore, any dispute regarding daily comparisons is not a genuine issue of *material* fact.

*unexpected* by Upjohn." *Ante,* p 209 (emphasis added). This conclusion is based on Upjohn's process of monitoring tank levels. The lead opinion describes the monitoring process as follows:

> Each weekday of the year, an Upjohn employee measured the level of by-product in the tank. The employee recorded the measurement on a tank farm inventory sheet and turned the sheet over to his supervisor. Each day's sheet was reviewed, and compared with previous days' sheets which were kept on file at the UMC facility. [*Id.,* p 202.]

According to defendant Upjohn, however, the recordings were kept on separate sheets and *were not* "compared with previous days' sheets," until the monthly audit was performed. Since Upjohn disputes the daily comparison, there is a genuine issue of material fact, and it is inappropriate for this Court to decide which version of the facts it prefers.

Furthermore, having defined "sudden" to have a temporal element, it would seem prudent to determine the quickness with which this leak occurred. If the holes in the tank developed simultaneously upon the first day's influx of by-product, it could be declared a "sudden" occurrence. In fact, the majority opinion confirms my belief that the leak could have been sudden:

> Prior to August 16, 1982, the tank-level measurements remained constant at ten inches or 475 gallons. However, on August 16, 1982, the same day that Upjohn had pumped its first batch of approximately seventeen hundred gallons of the by-product into tank FA-129, the tank-level measurement read three inches or eighty gallons. [*Id.*]

This lends credence to the theory that the leak occurred "suddenly." The by-product apparently

ran out of the tank as rapidly as it was put in. Even if it were proper for this Court to make this factual determination, since the tank had maintained its structural integrity over the year since its last use, I cannot at this stage accept the factual conclusion that Upjohn *expected* this leak.

While Upjohn may have been negligent in its monitoring, the possibility of negligence is the very reason for purchasing comprehensive, general liability insurance. The lapse of time between the beginning of the leak and the discovery of the leak is not determinative of the question whether the leak was sudden or accidental. In *Wagner v Milwaukee Mutual Ins Co,* 145 Wis 2d 609; 427 NW2d 854 (1988), rev'd on other grounds 155 Wis 2d 737; 456 NW2d 570 (1990),[1] a leak in a gas pipe which continued over a three-year period was held to have been sudden. The pipe had been damaged in 1981 when cement footings were poured around it, but the leak was not discovered until 1984. The court reasoned that "reliance on the period of time that elapsed between the event that damaged the pipe and the discovery of the leak is misplaced. . . . The length of time that elapsed before the leak was discovered is irrelevant as to the suddenness of the discharge." 145 Wis 2d 616. This analysis applies here; there should be a determination whether the holes in the tank all gave way at once, producing a "sudden" discharge, rather than focusing on the length of time which elapsed before Upjohn discovered the leak.

I would remand for a factual determination regarding the "sudden and accidental" nature of this leak.

---

[1] The Wisconsin Supreme Court modified the appellate court's definition of "sudden and accidental" to mean "unexpected and unintended." This definition permits recovery for unexpected damage even if it occurs over time and removes any need for a determination how "quickly" the discharge occurred. 155 Wis 2d 746.

BRICKLEY, J., concurred with CAVANAGH, C.J.

LEVIN, J. (*dissenting*). The principal question presented concerns the construction and application of the pollution-exclusion clause of the comprehensive general liability (CGL) policy, and in particular the phrase "sudden and accidental."

The majority holds that "sudden and accidental" is unambiguous, that "when considered in its plain and easily understood sense, 'sudden' is defined with a 'temporal element that joins together conceptually the immediate and the unexpected,' "[1] and that " '[a]ccidental' means '[o]ccurring unexpectedly and unintentionally; by chance.' "[2]

Then, focusing solely on the definition of "sudden," the majority finds that the leak from Upjohn's underground storage tank "could not possibly be considered '*sudden*' because the release of by-product from tank FA-129 was not *unexpected* by Upjohn."[3]

Upjohn's daily inventory records indicated that tank FA-129 contained less fluid after the first batch of by-product was pumped into it than it had before. On the basis of this record, the majority finds that "the fact that the tank level on August 16, 1982, measured three inches or eighty gallons *precludes this Court from finding anything other than that Upjohn must have expected a leak in tank FA-129.*"[4]

The majority finds "*as a matter of law*" that Upjohn, under the theory of the "imputed-collective-knowledge standard," possessed sufficient information on the first day of the campaign to "expect" that tank FA-129 was leaking and would

[1] RILEY, J., *ante,* p 207.

[2] *Id.,* pp 207-208.

[3] *Id.,* p 209 (emphasis added).

[4] *Id.,* p 212 (emphasis added).

continue to leak until Upjohn stopped using it.[5] The majority concludes that, because the release of the by-product was not "sudden," in that it was not unexpected, it does not fall within the "sudden and accidental" exception, with the result that coverage under the policy is not triggered.

Two of my colleagues concur in part and dissent in part. They concur in the holdings that the phrase "sudden and accidental" is unambiguous and that the definition of the word "sudden" includes a temporal element. They dissent because "the grant of summary disposition in this case was inappropriate and because [they are] not convinced that this leak could not possibly, as a matter of law, have been sudden."[6] They would remand for a factual determination of whether the leak was "sudden and accidental."

I would hold that the phrase "sudden and accidental" is ambiguous, and that it means "unexpected and unintended." I would, with my dissenting colleagues, remand for trial. I join in their expression of disagreement with the extent to which the majority has acted as finder of fact to determine "as a matter of law" that the leak could not have been "sudden" or "unexpected."

I

Upjohn annually manufactures the antibiotic clindamycin in two-month-long "campaigns." Toxic by-products produced during the manufacturing process are pumped into a 10,000-gallon storage tank.[7] During the first twenty-two days of the 1982 campaign, virtually all the 15,000 gallons of toxic

---

[5] *Id.,* p 213.

[6] CAVANAGH, C.J., *ante,* p 217.

[7] This tank was specially manufactured of materials that would not be corroded by waste products.

by-product that were pumped into the tank leaked out. The leak was discovered during a monthly audit. According to Upjohn officials, daily tank level readings were taken by employees, recorded on separate sheets of paper, and turned in at the end of each day. These readings were audited monthly.

Immediately upon discovering the leak, Upjohn began a cleanup that included extracting the contaminant from the ground around the tanks and from groundwater. Upjohn provided drinking water for surrounding communities where wells had been contaminated. In 1987, the EPA entered a consent order requiring Upjohn to continue monitoring, and in 1989 a cleanup order was entered. Upjohn expended $6.7 million on the cleanup.

Allstate is one of Upjohn's excess liability insurers.[8] While the policy's indemnification provision reimburses Upjohn for both damages and expenses, and thus affords broader coverage than the standard CGL policy, the pollution exclusion is standard. Upjohn commenced an action against Allstate seeking to obtain coverage under the excess liability policy. The circuit court granted Upjohn's motion for summary judgment, holding that coverage was not excluded by the pollution exclusion because the leak was "sudden and accidental."[9] The Court of Appeals affirmed.[10] This Court granted leave to appeal and ordered this case consolidated with *Polkow v Citizens Ins Co of*

[8] Other coverage included property insurance, which reimbursed $3 million for cleanup costs, and primary liability insurance, which reimbursed almost $1 million.

[9] The circuit court also held that, while Upjohn was not entitled to reimbursement for damage to its own property it could recover for expenditures, including cleanup costs, to repair damage to the property of third parties, including groundwater, which is governmental property.

[10] 178 Mich App 706; 444 NW2d 813 (1989).

*America* and *Protective Nat'l Ins Co of Omaha v City of Woodhaven.*[11]

## II

The majority construes and applies the pollution-exclusion clause in the standard CGL policy issued by Allstate. In so doing, the majority asks and answers two questions: First, is "sudden and accidental" ambiguous? Second, if the phrase is unambiguous, what is the meaning?

Addressing the first question, the majority looks to three decisions of the United States Court of Appeals for the Sixth Circuit "which find the terms of the pollution exclusion to be unambiguous."[12] Each of these decisions[13] holds that there is a singular, "plain everyday" or commonsense meaning of the word "sudden." This everyday meaning is found to incorporate a temporal element that joins the concepts of immediacy and the unexpected.[14] "Accidental" is defined as "unexpected or unintended." The majority declares that the three Sixth Circuit decisions are persuasive, adopts their definition of "sudden and accidental," and holds that the phrase is unambiguous.

## III

I would hold that the pollution exclusion,[15] in

---

[11] 435 Mich 862 (1990).

[12] RILEY, J., *ante,* p 207.

[13] *United States Fidelity & Guaranty Co v Star Fire Coals, Inc,* 856 F2d 31 (CA 6, 1988); *United States Fidelity & Guaranty Co v Murray Ohio Mfg Co,* 875 F2d 868 (CA 6, 1989); *FL Aerospace v Aetna Casualty & Surety Co,* 897 F2d 214 (CA 6, 1990).

[14] According to *Star Fire, supra,* p 34, "*it is* [*not*] *possible* to define 'sudden' without reference to a temporal element that joins together conceptually the immediate and the unexpected." (Emphasis added.)

[15] The pollution exclusion states as follows:

particular the phrase "sudden and accidental,"
may be construed in more than one way by reason-
able laypersons. It is well established in insurance
law that a policy term is ambiguous when it is
susceptible to more than one reasonable defini-
tion.[16] The reasonableness of a definition is to be
assessed from the layperson's point of view.[17] In
the presence of two differing interpretations, only
one of which results in liability to the insurer, this
Court has consistently declared that the policy
should be read to provide rather than to exclude
coverage.[18] Further, as discussed in part IV, when a
policy term is ambiguous, courts may look to

This policy shall not apply:—

\* \* \*

(f) to bodily injury or property damage arising out of the
discharge, dispersal, release or escape of smoke, vapors, soot,
fumes, acids, alkalies, toxic chemicals, liquids or gaseous waste
materials or other irritants, contaminants or pollutants into or
upon land, the atmosphere or any watercourse or body of
water; but this exclusion does not apply if such discharge,
dispersal, release or escape is sudden and accidental.

[16] See, e.g., *Hecla Mining Co v New Hampshire Ins Co*, 811 P2d
1083, 1091-1092 (Colo, 1991); *Morgan v Prudential Ins Co*, 86 Wash 2d
432; 545 P2d 1193 (1976); *Prete v Merchants Property Ins Co*, 159 W
Va 508; 223 SE2d 441 (1976); *Shadbolt v Farmers Ins Exchange*, 275
Or 407; 551 P2d 478 (1976); *Garriguenc v Love*, 67 Wis 2d 130; 226
NW2d 414 (1975); *Alvarez v Southwestern Life Ins Co*, 86 NM 300;
523 P2d 544 (1974); *Clark v Prudential Ins Co*, 204 Kan 487; 464 P2d
253 (1970); *Wachovia Bank & Trust Co v Westchester Fire Ins Co*, 276
NC 348; 172 SE2d 518 (1970); *English v Old American Ins Co*, 426
SW2d 33 (Mo, 1968).

[17] See, e.g., *Marston v American Employers Ins Co*, 439 F2d 1035
(CA 1, 1971) (Puerto Rican law); *Morgan v Prudential Ins Co*, n 16
*supra; C & H Plumbing & Heating, Inc v Employers Mutual Casualty
Co*, 264 Md App 510; 287 A2d 238 (1972); *Reserve Ins Co v Staats*, 9
Ariz App 410; 453 P2d 239 (1969); *Logan v Victory Life Ins Co*, 175
Kan 88; 259 P2d 165 (1953).

[18] *Powers v DAIIE*, 427 Mich 602; 398 NW2d 411 (1986); *Ebert v
Prudential Ins Co*, 338 Mich 320; 61 NW2d 164 (1953); *VanZanten v
Nat'l Casualty Co*, 333 Mich 28; 52 NW2d 581 (1952); *Francis v
Scheper*, 326 Mich 441; 40 NW2d 214 (1949); *Hooper v State Mutual
Life Assurance Co*, 318 Mich 384; 28 NW2d 331 (1947); *Pietrantonio v
Travelers Ins Co*, 282 Mich 111; 275 NW 786 (1937); *Boesky Bros Corp
v USF&G Co*, 267 Mich 628; 255 NW 307 (1934).

extrinsic evidence of the term's meaning.[19] In this case, the extrinsic evidence—the drafting history of the pollution-exclusion clause—supports Upjohn's claim for coverage under the CGL policy.

The policy does not define "sudden and accidental."[20] When determining the meaning of words, definitions in recognized dictionaries may be considered. Authoritative dictionaries differ on the meaning of "sudden." *Webster's Third New International Dictionary,* p 2285, defines "sudden" in a number of ways: first, as "happening without previous notice . . . occurring unexpectedly . . . not foreseen." Then it lists synonyms for "sudden" that include "prompt" and "immediate." *The Random House Dictionary of the English Language* (2d ed), p 1900, defines "sudden" in a temporal sense as "happening, coming, made, or done quickly." Black's Law Dictionary (5th ed), p 1284, defines "sudden" as "[h]appening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for."[21]

---

[19] *Chicago Bd Options Exchange v Connecticut Gen'l Life Ins Co,* 713 F2d 254 (CA 7, 1983); *Aetna Ins Co v Getchell Steel Treating Co,* 395 F2d 12 (CA 8, 1968); *Great West Casualty Co v Truck Ins Exchange,* 358 F2d 883 (CA 10, 1966); *Fidelity & Casualty Co of New York v Seven Provinces Ins Co,* 345 F2d 227 (CA 6, 1965); *Union Ins Society v William Gluckin & Co,* 353 F2d 946 (CA 2, 1965); *Gribaldo, Jacobs, Jones & Associates v Agrippina Versicherunges AG,* 3 Cal 3d 406; 91 Cal Rptr 6; 476 P2d 406 (1970); *Transport Indemnity Co v Dahlen Transport,* 281 Minn 253; 161 NW2d 546 (1968); *Prince v Universal Underwriters Ins Co,* 143 NW2d 708 (ND, 1966). See also *Vigil v Badger Mutual Ins Co,* 363 Mich 380; 109 NW2d 793 (1961).

[20] Some courts have found that the failure of an insurance policy to define crucial terms may in itself render those terms ambiguous. See, e.g., *Buckeye Union Ins Co v Liberty Solvents & Chemicals,* 17 Ohio App 3d 127, 132-133; 477 NE2d 1227 (1984); *State Farm Mutual Automobile Ins Co v Shelton,* 368 SW2d 734 (Ky, 1963).

[21] As urged by Allstate, the sequence in which definitions of a word appear in different dictionaries may correspond to the date of a particular definition's first use rather than its currency or predominance. See *Just v Land Reclamation, Ltd,* 155 Wis 2d 737, 760; 456 NW2d 570 (1990) (Steinmetz, J., dissenting). Nonetheless, such differences in meaning are indicative of ambiguity.

Judicial efforts to define "sudden and acciden-tal" reflect this diversity of definition. In *New Castle Co v Hartford Accident & Indemnity Co,* 933 F2d 1162 (CA 3, 1991), the United States Court of Appeals for the Third Circuit said that the numerous decisions construing the pollution exclu-sion appear to be evenly divided between the competing constructions of the phrase, with half the cases holding, as does the majority here, that the clause bars coverage, and half holding that it does not.[22]

In *Just v Land Reclamation, Ltd,* 155 Wis 2d 737; 456 NW2d 570 (1990), the Wisconsin Supreme Court found that "sudden and accidental" was ambiguous because the term "sudden" has differ-ent meanings. The court noted that *Webster's* gives the primary meaning of "sudden" as un-expected, and a secondary meaning as "prompt," while the *Random House Dictionary* gives the primary meaning as "quickly" and the secondary meaning as "unexpected." This disparity, the court observed, is evidence of ambiguity. The court then quoted the Georgia Supreme Court:

> "Perhaps, the secondary meaning is so common in the vernacular that it is, indeed, difficult to think of 'sudden' without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang. *But, on reflection one realizes that, even in its popular usage, 'sudden' does not usually de-scribe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death.* Even when used to de-scribe the onset of an event, the word has an *elastic temporal connotation* that varies with ex-pectations: Suddenly, it's spring. See also Oxford English Dictionary, at 96 (1933) (giving usage ex-

[22] The cases are categorized and cited in ns 60 and 61, p 1195. See also *Hecla Mining Co,* n 16 *supra,* p 1091.

amples dating back to 1340, e.g., 'She heard a sudden step behind her'; and, 'A sudden little river crossed my path As unexpected as a serpent comes.' "[23] [Emphasis added.]

The Wisconsin Supreme Court concluded that because "sudden and accidental" is reasonably susceptible to more than one meaning, including abrupt and immediate as well as unexpected and unintended, it is ambiguous as used in the pollution-exclusion clause.[24]

In short, the scope of the pollution-exclusion clause, particularly the phrase "sudden and accidental," has been the subject of intense and frequent litigation since adoption by the insurance industry in the early 1970s. Such profound disagreement among courts over the construction of the same phrase in standard-form insurance policies itself is evidence of ambiguity.[25] See cases cited

[23] 155 Wis 2d 737, 745-746; 456 NW2d 570, quoting *Claussen v Aetna Casualty & Surety Co,* 259 Ga 333, 335; 380 SE2d 686 (1989).

[24] The Supreme Courts of Georgia and Colorado agree. *Claussen,* n 23 *supra,* p 335; *Hecla Mining Co,* n 16 *supra.*

[25] Several courts have concluded that the substantial conflict in authority regarding the meaning, even if not dispositive, suggests that there is indeed ambiguity. These include *United States Fidelity & Guaranty Co v Thomas Solvent Co,* 683 F Supp 1139, 1155-1156 (WD Mich, 1988) (Michigan law), *Just,* n 21 *supra,* 759-760, *Grinnell Mutual Reinsurance Co v Wasmuth,* 432 NW2d 495, 499 (Minn App, 1988), *New Castle Co, supra,* pp 1193-1194, and *Hecla Mining Co,* n 16 *supra,* p 21. The same conclusion has been reached in cases construing other insurance policy terms: *Michigan Mutual Ins Co v Combs,* 446 NE2d 1001, 1007 (Ind App, 1983) ("respectable lines of authority producing conflicting interpretations of the word 'upon'" contribute to a finding that the term is ambiguous as used in automobile policies); *General Credit Corp v Imperial Casualty & Indemnity Co,* 167 Neb 833, 843-844; 95 NW2d 145 (1959) (a clause requiring a mortgagee to pay premiums on a real-property policy could be read as either a condition or a covenant; conflicting authority indicates ambiguity); *Olmstead & Co v Metropolitan Life Ins Co,* 118 Ohio St 421, 426-427; 161 NE 276 (1928) (same); *Gould Morris Electric Co v Atlantic Fire Ins Co,* 229 NC 518, 520; 50 SE2d 295 (1948) (the phrase "collision of the conveyance on which the goods are carried" was ambiguous because it was reasonably susceptible of two meanings, as reflected in conflicting authority).

in *Just* and *New Castle Co,* and see 13 Appleman, Insurance Law & Practice, § 7404, p 337, and cases cited in n 96. The extensive debate concerning the meaning of the phrase indicates that determining the correct construction is not "simple, direct [and] straightforward" as Allstate contends.

### IV

Courts that find the phrase "sudden and accidental" to be reasonably susceptible to different meanings, and therefore ambiguous, generally turn to the well-documented drafting and marketing history of the CGL's pollution exclusion.[26] By and large, those courts finding that the phrase is unambiguous do not address this history, even to the extent of acknowledging its existence.[27]

The CGL policy's drafting history has been extensively documented in many law review articles, and summarized in many cases. See *Just, supra,* p 747; *Claussen v Aetna Casualty & Surety Co,* 259

[26] I acknowledge that, as Allstate contended at oral argument, the drafting history of the pollution-exclusion clause was not made part of the record. I note, however, that industry representations were in some instances a condition precedent to approval of the revised phrasing by state insurance commissioners and other regulatory bodies, and that the proceedings leading to approval are matters of public record of which judicial notice may be appropriate. Courts that have considered the drafting history as extrinsic evidence of the meaning of "sudden and accidental" have done so without addressing the question whether the drafting history should have been made part of the record. If Allstate were to offer evidence that the version of the drafting history set forth here is inaccurate or incomplete, Allstate would be entitled to an opportunity to present such evidence.

[27] But see *Lumbermens Mutual Casualty Co v Belleville Industries, Inc,* 407 Mass 675, 682; 555 NE2d 568 (1990), where the Massachusetts Supreme Court found that the term "sudden" unambiguously carries a temporal component. Only after finding the term unambiguous did the court state that "[b]ecause the word 'sudden' in the pollution exclusion clause is not ambiguous, we have no need to consider the drafting history of that clause or any statements made by insurance company representatives concerning the intention of its drafters."

Ga 333; 380 SE2d 686 (1989); *New Castle Co,
supra.* In brief, industrywide revisions of the CGL
standard-form policy occurred in 1966 and in 1973.
Before 1966, the standard CGL policy covered bod-
ily injury and property damage "caused by acci-
dent." The term "accident" was not defined in the
policy, although insurers argued that the term
encompassed only "brief catastrophic events" and
not "gradual damage." Courts generally rejected
the insurers' arguments, holding that "accident"
encompassed "unintended injury or damage result-
ing from, among other things, extended exposure
to pollutants."[28]

In 1966 the insurance industry acknowledged
case law and revised the standard language to
provide "occurrence based" coverage. The revised
standard-form policy defined "occurrence" as

> an accident, including continuous or repeated ex-
> posure to conditions, which results during the
> policy period, in bodily injury or property damage
> neither expected nor intended from the standpoint
> of the insured.

The 1966 standard occurrence-based policy thus
explicitly covered property damage resulting from
gradual pollution. Courts generally extended cov-
erage to all pollution-related damage, even if it
arose from the intentional discharge of pollutants,
unless the ultimate loss was either expected or
intended. At the time this policy change was im-
plemented, representatives of the insurance indus-
try stated that it was to be viewed as "a broaden-
ing of coverage," and that under the new policy,
an insured would be covered " 'until such time as

---

[28] This sketch of the drafting history is taken from the courts'
summaries in *Claussen, Just,* and *New Castle Co.*

[he] becomes aware that the damage was being done.' "[29]

In the early 1970s, the standard-form policy was revised to add the pollution exclusion at issue in this case. Under this provision, only pollution-related losses that arose from occurrences both "sudden" and "accidental" would be covered. One writer explains that the exclusion was designed to decrease claims for losses caused by expected or intended pollution by providing an incentive to improve manufacturing and disposal processes. Unintentional or unexpected *damages* would still be covered as an "occurrence" under the policy.[30]

The insurance industry submitted this revision to state regulatory authorities for approval. In West Virginia and Georgia, the dialogue between the insurance industry and the regulatory authority is a matter of public record.

The West Virginia Insurance Commissioner approved the terms of the pollution exclusion *only* on the basis of representations, made orally and in writing by the Mutual Insurance Rating Bureau, one of the two major insurance trade associations, that they were " 'merely clarifications of existing coverages as defined and limited to the definitions of the term "occurrence," contained in the respective policies to which said exclusions would be attached.' "[31]

---

[29] Lyman J. Baldwin, Jr., Secretary of Underwriting, Insurance Company of North America, quoted by *Just, supra*, p 749.

[30] Greenlaw, *The CGL policy and the pollution exclusion clause: Using the drafting history to raise the interpretation out of the quagmire*, 23 Colum J of L & Soc Prob 233 (1990).

[31] The Mutual Insurance Rating Bureau, which assisted in the draft of the exclusion endorsement, in a submission to the West Virginia Commissioner of Insurance, explained that the intent of the clause was to clarify " 'that the definition of occurrence excludes damages that can be said to be *expected or intended*.' " [*Just, supra*, pp 750-751.]

In Georgia, the Insurance Rating Board, the other major insurance trade association, represented to the Insurance Commissioner that the clause was intended to shut out only intentional polluters, that the change would have no effect on the vast majority of risks, and that it was intended only as a clarification of existing coverage.[32]

The insurance industry described the pollution exclusion to its agents as follows:

> "In one important respect, the *exclusion* simply reinforces the definition of occurrence. [The policy] will not cover claims where the *'damage was expected or intended'* by the insured and the exclusion states, in effect, that the policy will cover *incidents* which are *sudden and accidental—unexpected and not intended.*"[33]

It is against this backdrop that at least half the cases construing the pollution-exclusion clause have found it to be ambiguous. Of these, some have read the clause to provide coverage for injury or damage caused by an unintentional and unexpected *event.* See *New Castle Co, supra,* and cases there cited. Other cases, which find the clause ambiguous, hold that "sudden and accidental" is simply a restatement of the definition of "occurrence" and that policies incorporating the pollution-exclusion clause cover claims where the alleged *injury* or harm was "neither expected nor intended." See *Just, supra,* and cases there cited.

V

Once the phrase "sudden and accidental" is found to be reasonably susceptible of more than

---

[32] *Claussen, supra,* pp 335-336.

[33] Excerpted from *The Fire, Casualty & Surety Bulletin,* as quoted in *Just, supra,* p 752 (emphasis added).

one meaning, it is ambiguous as a matter of law.
Such ambiguity is resolved in favor of the insured:
the exception to the pollution clause, intended by
its drafters as a restatement of "occurrence," cov-
ers "unexpected or unintended damage or results."
Taken as a whole, the pollution-exclusion clause
and exception thus preclude coverage only when
the insured intentionally or recklessly causes in-
jury or damage.

## VI

The majority determines that the phrase "sud-
den and accidental" is unambiguous and properly
means "happening quickly and unexpectedly." It
then proceeds to review the evidence. However,
rather than relying on the definition it has just
adopted, the majority uses the definition that
plaintiff Upjohn argues is appropriate, i.e., that
"sudden and accidental" means "*unexpected* and
unintended."

The majority holds that the release of toxic
material at issue "could not possibly be considered
'sudden' because the release of by-product from
tank FA-129 was not unexpected by Upjohn."[34] The
majority thus resolves the issue solely on the basis
of the "unexpected" component of the term "sud-
den," despite its determination, following *United
States Fidelity & Guaranty Co v Star Fire Coals,
Inc,* 856 F2d 31 (CA 6, 1988), that "sudden" could
not be defined without reference to its temporal
component.[35]

The majority assumes the role of factfinder in
applying "sudden and accidental" to the "facts."
The majority focuses on whether the leak was

[34] Riley, J., *ante,* p 209.
[35] See n 1.

"unexpected," and concludes, as a matter of law, that it was not. That conclusion is flawed, because the majority first fails to distinguish between raw data and knowledge, second, misapplies agency principles, and, third, turns a question of fact into a question of law.

The majority states, "*as a matter of law,* that the Upjohn Company had sufficient information available to it on August 16, 1982, to expect that a chemical by-product was escaping from a leak in tank FA-129."[36] Upjohn may be charged with this expectation, the majority says, because, under the "imputed-collective-knowledge standard," information collected by the employees who recorded the level of fluid in the tank was immediately imputed to the corporation.[37] The leak was *expected* because the company *knew,* on the first day the tank was used on the clindamycin manufacturing run, that fluid levels in the tank went down instead of up after the chemical was pumped into the tank.

The "imputed-collective-knowledge" standard employed by the majority stems from agency principles applicable to knowledge attributable to a corporation. In *Gordon Sel-Way, Inc v Spence Bros, Inc,* 177 Mich App 116, 124; 440 NW2d 907 (1989),[38] cited by the majority for this "imputed-collective-knowledge" standard, the Court of Appeals considered what a corporation is deemed to know and when it is deemed to know it. The Court said that one of the burdens attendant upon the corporate form is that the law imputes the knowledge of individual officers and employees *at a certain level of responsibility* to the corporation. This principle speaks to persons *representing a corporation* who, acting in the scope of their em-

---

[36] *Ante,* p 212 (emphasis added).

[37] *Id.,* p 215.

[38] Currently pending before this Court on other issues.

ployment and authority, learn or do something on behalf of the corporation.

According to Upjohn, the tank level inventory record, consisting of the separate slips of paper on which the daily readings were recorded, was audited on a monthly basis. The records covering the 1982 clindamycin campaign were audited, pursuant to standard Upjohn procedures, between September 1 and September 3, 1982. Only on September 3, 1982, did Upjohn employees *at the appropriate level of responsibility* determine that a leak had occurred. Further, Upjohn executives testified on deposition that tank FA-129 was specially manufactured of materials not subject to corrosion by clindamycin by-products.

Upjohn executives also testified on deposition that because tank FA-129 was part of a "tank farm," a reduced tank level did not necessarily indicate a leak because materials could have been accidentally or unintentionally diverted to other tanks, production could have been interrupted, or materials may have been intentionally removed from the tank for disposal.

In conclusion, the majority errs in finding that Upjohn *must have known* on the first day of the clindamycin manufacturing campaign that tank FA-129 was leaking. What Upjohn possessed between August 16 and September 3, 1982, was raw, unanalyzed data, *not* knowledge. Upjohn could indeed have audited and analyzed the data and drawn conclusions on a daily basis. Those conclusions, if known to a person "*at a certain level of responsibility,*" might be imputed to the corporation. The adequacy of Upjohn's procedures for auditing and analyzing the fluid level of the tank is a question of reasonableness under the circumstances, and therefore is not a question of law.

I would reverse and remand for trial.