The UPJOHN COMPANY and the
Asgrow Florida Company,
Plaintiffs,

v.

AETNA CASUALTY AND SURETY COM-
PANY and General Accident Insurance
Company of America, Defendants.

No. K88–124CA4.

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 26, 1993.

Paul T. Sorensen, Warner, Norcross & Judd, Grand Rapids, MI, Eric C. Bosset, Covington & Burling, Washington, DC, for plaintiffs.

. William J. Heaphy, Vandeveer Garzia, PC, Holland, MI, Charles W. Browning, Vandeveer Garzia, PC, Detroit, MI, for Aetna Cas. & Sur.

L. Roland Roegge, Smith, Haughey, Rice & Roegge, PC, Grand Rapids, MI, for General Acc. Ins.

Robert J. Dugan, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, MI, Barry R. Ostrager, Simpson, Thacher & Bartlett, New York City, for Travelers Ins.

## MEMORANDUM OPINION
## AND ORDER

McKEAGUE, District Judge.

This is an action for declaratory relief and breach of contract brought by plaintiffs against their insurers. Now before the Court is defendant Aetna Casualty and Surety Company's ("Aetna") motion for summary judgment as to 16 sites and partial summary judgment as to two sites. The Court having

previously granted The Upjohn Company's ("Upjohn") motion for leave to file an amended complaint which dismissed twelve of the 26 sites from this action. Consequently, Aetna's motion for summary judgment now relates to only the following five (5) sites: Berlin & Farro, Chemical Control, Fisher–Calo, Liquid Disposal, Inc., and Scientific Chemical Processing. Aetna's motion for partial summary judgment relates to the following two (2) sites: K.L. Ave. Landfill and from Pulverizing Services, Inc.

Aetna's motion for summary judgment is based upon a "pollution exclusion" clause contained in the policies issued from March 1, 1972 through March 1, 1985.[1] Aetna contends that coverage for the damage which occurred at these sites during the relevant time period is excluded by this pollution exclusion clause, and that the "sudden and accidental" exception to this exclusion does not apply. Upjohn contends that there are factual disputes as to the circumstances of the releases which preclude an award of summary judgment. The Court heard oral argument on this motion on October 26, 1992, and finds the matter ready for disposition.

## STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court determines whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Of course, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v.*

*Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). The movant meets its initial burden "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). At that point, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c).

This Court's duty, when sitting in a diversity case, is to apply the state law that the state court would apply. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Furthermore, the federal court must apply a state's law in accordance with the controlling decisions of the highest court of that state. *Vanderbark v. Owens–Illinois Glass Co.,* 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941); *Grantham & Mann v. American Safety Products,* 831 F.2d 596, 608 (6th Cir.1987) (citations omitted). Michigan law, therefore, controls in this case. If the highest court has not spoken, the federal court must ascertain what the state law is and apply it. *Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985). The Court is not free to disregard the opinion of an intermediate state court unless it is convinced the highest court would decide otherwise. *FL Aerospace v. Aetna Casualty & Sur. Co.,* 897 F.2d 214, 218 (6th Cir.), *cert. denied,* 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990).

## ANALYSIS

The Court must first address several preliminary questions as to the interpretation of the insurance contract before turning to the applicability of the pollution exclusion to the sites that are the subject of this motion.

### I. *Preliminary Issues*

#### A. Burden of Proof

The parties dispute which party bears the burden of proving that the property dam-

---

1. The policies state that the "company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages," except that the policies do not apply to liability:

arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids,

alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminates or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

age was caused by a sudden and accidental discharge. Michigan law holds that the insurer bears the burden of proving an absence of coverage, that is, the applicability of an exclusion. *Roddis Lumber & Veneer Co. v. American Alliance Ins. Co.,* 330 Mich. 81, 47 N.W.2d 23 (1951). Therefore the insurer, Aetna, bears the burden of showing the pollution exclusion bars coverage at each site. The allocation of the burden of proving an exception to an exclusion, however, has not been conclusively established under Michigan law.

Although the Michigan Supreme Court has not directly addressed this matter, it arguably has provided some guidance, holding that exceptions to exclusions to coverage are not the same as a grant of coverage. *Fresard v. Michigan Millers Mutual Ins. Co.,* 414 Mich. 686, 698, 327 N.W.2d 286 (1982). Although this opinion provides some indication that the court would not place the burden on the insured, an interpretation advocated by Upjohn, the value of this opinion is diminished for two reasons. First, the *Fresard* case did not analyze exceptions to exclusions in the context of burden of proof; rather, the case required the court to construe exclusion clauses in a comprehensive general liability insurance policy and decide whether an exception to an exclusion could be subject to other exclusions in the policy. Secondly, *Fresard* has no precedential value as it is a decision from an equally-divided court. *Negri v. Slotkin,* 397 Mich. 105, 109, 244 N.W.2d 98 (1976).

There is also nonbinding case law that would support the construction advanced by Upjohn. Courts placing the burden of proof on the insurer have done so on the basis of the traditional distinction between coverage clauses and exclusion clauses. The insurer carries the burden of proving an exception to coverage, and these courts view an exemption as part and parcel of the exclusion

clause. See, *New Castle County v. Hartford Acc. & Indem. Co.,* 933 F.2d 1162 (3rd Cir. Del.1991); *U.S. Fidelity & Guar. Co. v. Morrison Grain Co., Inc.,* 734 F.Supp. 437 (D.Kan.1990).

Case law from this circuit, however, supports Aetna's argument that the burden of proving an exception to an exclusion rests with the insured. In *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 702 F.Supp. 1317 (E.D.Mich.1988), the district court directly addressed the burden of proof issue. It held that factors such as probabilities, fairness and policy considerations were to be evaluated prior to allocation of the burden of proof. *Id.* at 1328, citing *Johnson v. Austin,* 406 Mich. 420, 432, 280 N.W.2d 9 (1979). The court then decided, under circumstances similar to those here, that all of these elements weighed in favor of allocation of the burden to the policyholder. *Id.* at 1329.

The court first estimated the probabilities and decided allocation to the policyholder seemed appropriate. Because policyholders must contend that they come within the sudden and accidental exception to the pollution exclusion, they must argue that the more unusual event occurred. *Ex–Cell–O,* 702 F.Supp. at 1328. The court then found that because policyholders have greater access to the information pertaining to their activities, fairness supports assignment of the burden to the policyholder. *Id.* Finally, in evaluating policy considerations, the court concluded that because the courts are split as to whether the insured or the insurer has the burden of proof in this matter and the other two factors favor the burden falling to the policyholder, the burden was on the policyholder. *Id.*[2]

This Court adopts the reasoned approach to allocation of this burden taken in *Ex–Cell–*

---

**2.** Many courts faced with this issue have adopted *Ex–Cell–O* without discussion. See, e.g., *Christopher v. Hartford Ins. Group,* 89–CV–72492–DT (E.D.Mich. July 1, 1992); *United States Fidelity & Guar. Co. v. City of Menominee,* 87–4939–CE (Menominee Cty.Cir.Ct., February 3, 1992). This adoption of the *Ex–Cell–O* approach is also supported by the Sixth Circuit's opinion in *FL Aerospace v. Aetna Cas. & Sur. Co.,* 897 F.2d 214 (6th

Cir.1990). The appellate court affirmed the lower court's judgment of no cause of action in favor of the insurer because there was no evidence of any sudden and accidental discharge of pollutants. *Id.* at 220. If the burden were on the insurer to show the discharge was *not* sudden and accidental, and no such evidence was presented, the court would have awarded summary judgment to the insured.

$O.$[3] This approach appears both fair and reasonable to the Court. To hold otherwise would place an insured in the largely untenable position of proving a negative. The Court agrees that public policy is better served by this allocation, and additionally notes that the contract of insurance between the parties does not provide any means by which the insurer determines where hazardous wastes are to be disposed, how they should be disposed, nor does the contract of insurance provide a mechanism whereby the insurer approves the transporters. Placing the burden on the insurer of proving that the exception to the exclusion does not apply, would in effect force the insurer to monitor the insureds' activities, as well as the activities at the disposal site, to protect itself from liability. This allocation of the burden by the Court would in effect rewrite the contractual relationship between the parties. This the Court should not and will not do.

For these reasons, the Court finds that the Michigan Supreme Court would adopt the *Ex–Cell–O* approach if it were to directly address this issue. Accordingly, the Court finds that the insured bears the burden of proving the applicability of the exception to the pollution exclusion. Having determined that Upjohn bears this burden, the Court now turns to the policies that are the subject of the motion.

## B. Pollution–Causing Release

■ The next issue before the Court is whether the policy exclusion is limited to the discharge of Upjohn's waste materials, a position advocated by Upjohn and rejected by Aetna. Aetna asserts that because Upjohn may be jointly and severally obligated to pay "all costs" of conducting a comprehensive

clean-up under CERCLA and abate environmental damage resulting from contamination even if caused by parties other than Upjohn, it cannot claim that the plain and ordinary language of the pollution exclusion limits coverage only to property damage occasioned by the discharge of Upjohn's contaminants.

This argument seemingly comports with the underlying policy of CERCLA. Liability provisions for off-site generators do not require proof that the specific substances they generated and sent to the site were present at the facility at the time of release. The statute is "satisfied by proof that hazardous substances 'like' those contained in the generator defendants' waste were found at the site." *United States v. Monsanto Co.*, 858 F.2d 160, 169 (4th Cir.) *cert. denied* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). There is no need to trace ownership of each generic chemical compound found at a site. *Id.*

Upjohn, on the other hand, argues that the relevant discharge is the discharge of the insured's waste. Should the Court adopt this position, a plaintiff could not rely on the sudden and accidental discharges of some other company's waste to qualify for coverage.[4] This appears to be the approach adopted by the Sixth Circuit in *FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214 (6th Cir.1990), *cert. denied*, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). In *FL Aerospace*, the Court looked at the discharge of the plaintiff's pollutant. The lack of evidence from which the court could find that any pollution damage was caused by any sudden and accidental discharge from the plaintiff's waste resulted in a finding of no cause of action against the insurer. *Id.* at 220.[5]

3. The plaintiffs argue that the decision should be limited to those situations in which the disposal occurred on-site, as the analysis fails to take into account those situations in which the carrier for an off-site disposal facility receives claims from a variety of policyholders, thereby creating greater and easier access to information by the insurer. The Court notes that the disposal in *Ex–Cell–O* occurred at both off-site and on-site locations. Accordingly, the argument does not provide the Court with substantial reason to reject the reasoned analysis therein.

4. Although this position appears inexplicable in the abstract, the particular facts at several sites, in addition to Upjohn's position that Aetna bears the burden of proving the pollution-causing releases were neither sudden nor accidental, clarify the rationale upon which this argument is based.

5. The Court notes that Aetna argued in that case that the releases of the plaintiff itself were the only ones that the Court should considered. Plaintiff could not rely on a spill from another waste generator to assess whether the spill was

The Court finds that *FL Aerospace* is not dispositive. In that case, the court was deciding whether the sudden and accidental exception applied, not whether the pollution exclusion only excluded from coverage those releases caused by the insured. Furthermore, the Court finds that the plain language of the policy is even more persuasive than the arguments advanced by either party.

The policy itself does not restrict the exclusion to liability premised on the conduct of someone other than the insured or to liability premised on the conduct of the insured. Rather, the exclusion applies to any "discharge, dispersal, release or escape" that is not sudden and accidental. The policy could easily have been written to avoid liability arising only out of Upjohn's discharge or dispersal, had that been the parties' intent. Because the language of the policy is not so limited, the Court will not read such a limitation into the policy. See, *Park–Ohio Industries, Inc. v. Home Indemnity Co.*, 975 F.2d 1215, 1222 (6th Cir.1992) (interpreting the pollution exclusion applicability to product liability under Ohio law).[6]

■ Here the Court need not look outside the clear and plain language of the pollution exclusion. Although ambiguous or incomplete contractual language may give rise to a question of fact, construction of a contract generally is a question of law for the court. *Mid America Mgmt. Corp. v. Dep't of Treasury*, 153 Mich.App. 446, 459–60, 395 N.W.2d 702 (1986). Under Michigan law, an unambiguous policy provision is enforced as written. *Eghotz v. Creech*, 365 Mich. 527, 530, 113 N.W.2d 815 (1962). The policy here is unambiguous and there is no need for Upjohn to show that the release of *its* waste was sudden and accidental. It is the discharge that caused the pollution that is the focus of the analysis, not the source of the discharge.[7] Accordingly, it is the ruling of this Court that if any of the discharges upon which Upjohn's liability is premised can be shown by Upjohn to be sudden and accidental, the damage resulting from that discharge is covered under the policy.

## C. Admissibility of Documents

■ The final preliminary matter is the admissibility of documents offered by Aetna in support of its motion. The documents upon which Aetna relies to support its motion were obtained through Freedom of Information requests directed to public governmental agencies. Affidavit of Goss, Exh. U.[8] Aetna contends that the documents are subject to

---

sudden and accidental, thereby qualifying it for coverage.

6. Further, the Sixth Circuit has noted that the standard pollution exclusion clause contains no distinction between active and passive polluters, and refused to read such a distinction into the policy in deciding issues of coverage. *United States Fidelity & Guar. Co. v. Murray Ohio Mfg. Co.*, 693 F.Supp. 617, 621 (M.D.Tenn.1988), aff'd, 875 F.2d 868 (6th Cir.1989).

7. In *United States Fidelity & Guar. Co. v. George W. Whitesides Co.*, 932 F.2d 1169 (6th Cir.1991), the Sixth Circuit construed an identical exclusion clause under Kentucky law, holding that the policy excluded coverage for claims against the insured, even though the insured did not itself release any pollutants. In *Whitesides*, the insured delivered toxic waste to a transporter for disposal. *Id.* at 1170–71. The EPA identified the insured, a solvent reclamation plant, as a Potentially Responsible Party.

The insured requested a defense and indemnification from its insurer. The Sixth Circuit agreed with the district court's analysis which noted that the policy did not say that it would not insure against liability for Whitesides' release,

but stated it would not insure against liability for the release. *Id.* at 1171.

8. Although the affidavit sets forth the source of the documents, it does not set forth the qualifications of the authors of the documents or the bases of their conclusions. Upjohn maintains that reports, even those of state officials, that claim to describe historical practices occurring before the state official ever visited the site, lack foundation and are inadmissible hearsay. See *Miller v. Caterpillar Tractor Co.*, 697 F.2d 141 (6th Cir.1983); *Complaint of Paducah Towing Co.*, 692 F.2d 412 (6th Cir.1982); *Dallas & Mavis Forwarding Co. v. Stegall*, 659 F.2d 721 (6th Cir.1981) (state trooper's report regarding the exact location of accident ruled inadmissible because it consisted of statements of biased eyewitnesses). Cf. *United States v. School Dist. of Ferndale, Michigan*, 577 F.2d 1339 (6th Cir.1976); *Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir.1978) (interpret the rule); *United States v. Northernaire Plating Co.*, 670 F.Supp. 742 (W.D.Mich.1987) (court allowed the introduction of an affidavit that relied upon reports generated by the United States Environmental Protection Agency and the Michigan Department of Natural Resources pursuant to the hearsay exception).

the public records exception to the hearsay rule. Fed.R.Evid. 803(8) provides in pertinent part that hearsay does not include:

Records, reports, statements ... in any form, of public officers or agencies, setting forth ...

(B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... or

(C) ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The basis for this hearsay exception as justified in the Advisory Committee notes arises out of the assumption that a public official will perform his duty properly and probably will not remember the details of a particular case. Fed.R.Evid.

■ The burden of showing the untrustworthiness of the report is on the party opposing the admission. *United States v. Northernaire Plating Co.*, 670 F.Supp. 742 (W.D.Mich.1987) citing *Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir.1987), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979). Upjohn has done nothing more than assert that the reports are inadmissible. This bald assertion does not satisfy its burden. Accordingly, the Court will consider the reports in the disposition of this motion. The Court must now decide whether releases at the above-named sites were sudden and accidental as a matter of law.

## II. *Individual Sites*

■ As previously discussed, the policies containing the pollution exclusion clause do not provide coverage for Upjohn's liability based on pollution damage unless the discharge creating liability is both sudden and accidental. The Michigan Supreme Court has decided that "sudden" includes a temporal element as well as a sense of the unexpected, and "accidental" means unexpected and unintended. *Upjohn v. New Hampshire Ins. Co.*, 438 Mich. 197, 207–08, 476 N.W.2d 392 (1991). These are the standards against which the site specific events must be measured as the Court rules on Aetna's motion.

In addition, the Court is guided by the principle established in *FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214 (6th Cir. 1990), that the sudden and accidental exception "applies to the discharge, release, dispersal or escape of pollutants into the environment." *Id.* at 220. The court found that the delivery of waste was not the equivalent of a discharge of pollutants, thereby dispelling Aetna's contention that because Berlin & Farro transported 500,000 gallons of Midland–Ross waste to the site over a period of years, none of the discharges could be considered sudden and accidental. *Id.* The Court, guided by these principles, now addresses the individual sites to determine whether there remains a genuine issue of fact as to whether the pollution at this site was sudden and accidental.

### A. Berlin & Farro

■ The Berlin & Farro facility operated as a liquid industrial waste facility from 1971 to 1980, and was licensed by the state to receive and incinerate these wastes. The facts show that Upjohn shipped over one million gallons of waste solvent to the Berlin & Farro liquid incineration site between 1973 and 1975. All of the policies written by Aetna during this period contained the pollution exclusion clause.

A Michigan Department of Natural Resources' ("MDNR") interoffice communication dated February 10, 1978, targeted potential contamination problems from spillage and discharges of the kind that had occurred at the facility since 1973, and leakage from tank storage and the storage lagoons. The south storage lagoon held sludge containing a significant concentration of C–56 and related compounds. Removal prior to "spring thaw" was recommended to prevent further surface water contamination. Groundwater contamination was identified as a potential problem if removal were not timely. The company's file showed numerous instances of spillage or discharges of liquid industrial waste to the ground. There was evidence of drum crushing at the facility despite the unacceptability of this practice.

A MDNR progress report dated August 16, 1982, stated that "although liquid wastes were not to have been buried or landfilled on-site, it is evident that a large quantity of wastes were [sic] illegally buried in the landfill ..." The report also stated that as a result, groundwater and soils on the site were contaminated through leakage of drums and spills.

Upjohn's argument in support of coverage at this site is premised on the assumption that Aetna must show the release of Upjohn's wastes was neither sudden nor accidental.[9] Upjohn is correct that the documentation of the pollution that occurred on the Berlin and Farro site does not connect any of the damage to a discharge of Upjohn's waste. As previously stated, however, this Court takes a broad view of the discharge causing pollution, as it must in light of the language of the policy, and it is not necessary to establish that the damage was caused by a release of Upjohn's waste. Accordingly, the Court turns to the question of whether the release was sudden and accidental.

After reviewing the documents relating to this site, the Court finds a genuine factual dispute remains as to at least one release which may have been abrupt and unintended. James Rossio, a former water quality investigator with the Michigan Water Resources Commission, testified that he investigated a complaint about a discharge from a lagoon containing residual sludge in November of 1974. Exhibit 26. Rossio testified that the pH of the effluent revealed that damage would have occurred quickly and because he observed no damage to surrounding plant life, he concluded that the discharge was brief. Rossio also stated that he believed muskrats appeared to have bored a hole into the lagoon. Upon cross-examination, however, he revealed his suspicion that the discharge may have been intentional. Exhibit 26 at 39.[10]

Because the issue of insurance coverage turns on the discharge which caused the pollution, rather than on the discharge of Upjohn's waste, the Court finds that there remains a question of material fact as to whether the discharge in November of 1974 was sudden and accidental. Upjohn has not presented any other evidence to the Court to support the applicability of the sudden and accidental exception to the pollution exclusion at this site. Nevertheless, the Court **DENIES** Aetna's motion as to this site based upon the single disputed release.

### B. Chemical Control

■ Chemical Control Corporation ("Chemical Control") is a hazardous waste processing facility that accepted waste for recovery or disposal. Upjohn's waste was sent to this site during the periods in which the insurance policies issued by Aetna included the pollution exclusion clause. Exhibit L2.

In 1978, a large quantity of drums containing hazardous substances were stockpiled on-site in tiers up to five high. Many were deteriorated and leaking. Sewer lines were found to have been contaminated by solvents. Improper storage and improper segregation of wastes created problems. Although it was not then possible to obtain an accurate inventory of wastes, the Office of Hazardous Substances Control devised a cleanup strategy. Before cleanup was completed, however, a fire enveloped the site. Numerous explo-

9. Upjohn contends that its waste solvents were sent to the site in tanker trucks, not drums, and the solvents were used as fuel for the incinerator. Its solvents were pumped into underground tanks at the site for storage prior to incineration. The solvents were piped directly into the incinerator from the tanks and employees tried to transfer the solvents without spilling them on the ground. Plaintiff's Exhibit 20–25. One tank truck driver, Russell Coons, testified that he never had a spill and that minor dribbles happened only once or twice. Mr. Berlin testified that "dribbles" were too small to be classified as spills and they were cleaned up immediately.

Mr. Berlin also testified that the C–56 residue would be cleaned from the bottom of the holding tank and the sludge was thrown into ponds. Dep. at 135. There is no evidence before the Court that the sludge contained Upjohn material.

Upjohn contends that the content of these exhibits create a question of fact as to whether the release of Upjohn materials was sudden and accidental.

10. The exhibits presented to the Court by plaintiffs are designated by number. Those presented by the defendant are designated by letter and number.

sions resulted, as did the destruction of drums. The contents were discharged into the ground and surrounding waters. Exhibit L4, Deposition of Neafsey.

Upjohn focuses on one particular release at this site wherein a fire caused 20,000 barrels of chemicals to explode and spread the contents into the environment. The New Jersey officials labeled the fire "sudden and accidental" in their site summary. Exhibit L3.

Aetna maintains that the fires at Chemical Control were a routine happening, and that this fact, in conjunction with the injunctive order issued in March of 1979,[11] clearly reflect that this site posed a flammability hazard. Based on this evidence, Aetna also infers that such fires were expected by the persons operating or in charge of the facility. See *Upjohn v. New Hampshire Ins. Co.,* 438 Mich. at 213–215, 476 N.W.2d 392. Aetna urges the Court to find that, as a matter of law, any fire could not be considered sudden and accidental.

The Elizabeth Fire Department summary sheet on Chemical Control shows it made several trips to the site. A review of the summary sheet indicates, however, that many of the runs did not involve fires. Based on the evidence presented, the Court cannot say as a matter of law that the persons operating the facility should have expected the fire at issue. Moreover, it occurred two years after the issuance of the injunctive order, in April of 1980. The report characterizes it as sudden and accidental, and a fire watch had been discontinued several months prior to the time this fire started.

Accordingly, the Court concludes that there remains a question of fact as to whether the release at this site was sudden and accidental and the question of fact is material. Therefore, summary judgment is **DENIED.**

### C. Fisher–Calo Chemical and Solvent Corporation

■ Upjohn sent recycled commercial-grade solvents to this site and denies that it disposed of or arranged for the treatment or disposal of any hazardous substances at the site. The transactions at this site began during the periods in which the insurance policies issued by Aetna included the pollution exclusion clause.

The EPA records on this site indicate that a "pattern of poor waste as well as general chemical management at the facilities with spills, leaks, dumping, [and] poor housekeeping" existed. Exhibit M4. Numerous citations were issued by regulatory agencies. Exhibit M4. A 1978 inspection indicated that a large number of drums containing unidentified industrial waste had been excavated by order of the LaPorte County Health Department and the storage drums were in a condition of deterioration. Exh. 6.

Upjohn's defense at this site is that because the solvents it sent to the site were valuable, any release of those materials would have to have been sudden and accidental. Upjohn has failed to provide this Court with any evidence, however, that the discharges at this site were sudden and accidental. Its belief that the valuable nature of its solvents creates an inference that any release of its materials must have been sudden and accidental is belied by the EPA records of poor management and the overriding incidents of leaks and spills. Accordingly, the Court **GRANTS** summary judgment as to this site.

### D. Liquid Disposal, Inc.

■ Upjohn-generated waste was transported to this facility in 1978 and 1979, a period during which the insurance policies issued by Aetna included the pollution exclusion clause.

The Remedial Investigation Final Report prepared for the MDNR indicates that throughout its operation, Liquid Disposal, Inc. "received numerous violation notices regarding National Pollution Discharge Elimination System ("NPDES") permits, fire violations, air discharges, high liquid levels in two on-site lagoons, and the improper stor-

---

11. The Superior Court of New Jersey, Chancery Division, appointed a receiver to effect a clean-up of the facility because the facility posed such a serious threat to public safety. Exhibit L5.

age of large quantities of waste-filled drums on site." Exhibit P3.

Upjohn contends that it sent bulk solvents for incineration to this site. Because the solvents were transported by tank trucks, Upjohn concludes that evidence of leaking drums is irrelevant to any determination of whether the pollution exclusion precluded coverage. Again, the Court finds that this fact does not satisfy the policy standard for coverage under the sudden and accidental exception to the pollution exclusion clause. Upjohn has failed to offer evidence to the Court that the discharges at this site were sudden and accidental. Accordingly, summary judgment is **GRANTED.**

### E.  Scientific Chemical Processing

Scientific Chemical Processing ("SCP") included two New Jersey sites that received waste from Upjohn, one in Carlstadt and one in Newark. The Court gives separate consideration to each site.

### 1.  Carlstadt

Between 1975 and 1978, Upjohn generated an aqueous waste stream containing one percent sodium cyanide. Exhibit 38. A contractor hauled this waste stream by tank truck to the Carlstadt facility. After its arrival, sodium hyperchloride was added to the solution to render it nonhazardous. It was then flushed down the sanitary sewer. Exhibit S4. All of Upjohn's disposal activity at this site occurred during a period when the Aetna policies included the pollution exclusion clause.

Aetna maintains that this facility routinely discharged liquid wastes into the soil, resulting in surface water and groundwater contamination. An inspection report dated September 8, 1978, indicates that the storage of drum waste was sloppy with leaking and spilling due to poor handling techniques. Other reports indicated drums leaked and the leakage ran into the ground. Exhibits S5–S8.

Accordingly, Aetna concludes that the discharges of waste at this facility were not sudden and accidental. Based on the evidence presented by both parties, the Court

agrees. Upjohn again argues that summary judgment must be denied because the leaking drums did not contain Upjohn waste. This argument does not satisfy Upjohn's burden in showing the discharge was sudden and accidental. Accordingly, summary judgment is **GRANTED.**

### 2.  Newark

Upjohn also sent 100 drums to the SCP Newark facility in March, 1979. Exhibit S3. Aetna maintains that the Newark facility was operated under the same business practices as the Carlstadt facility. Barrels were corroded and rusted and chemicals were spilled on the ground. Affidavit of Buchanan. Further, the affidavit of Walter Janicek, Senior Environmental Specialist for the City of Newark, documented the poor condition of the drums and the occurrence of spills inside and outside the building. Upjohn has not presented any evidence to suggest discharges of a sudden and accidental nature. Accordingly, the Court **GRANTS** summary judgment at this site.

### F.  K–L Ave. Landfill

Aetna moves for partial summary judgment at this site as Upjohn's wastes were sent there both before and during the time in which the insurance policies issued by Aetna included the pollution exclusion. Therefore, only those policies which contain the pollution exclusion are the subject of this motion.

From 1968 to 1979, Upjohn's solid wastes were hauled to the K–L Avenue landfill in Kalamazoo County. Upjohn sent solid waste materials containing such substances as chromium, toluene, methylene chloride, ammonium chloride, and zinc chloride. The landfill was licensed without stipulation at the time it was opened and inspections occurred on a regular basis.

In 1971, the County of Kalamazoo contracted with Balkema, Inc. to operate the landfill. Balkema used a "mound system" of landfilling which involved compacting and covering the solid waste on a steep slope. Exhibit 36. In 1971, the licenses contained a stipulation prohibiting the dumping of liquid waste.

A Michigan Department of Natural Resources' interoffice communication indicated that the Water Quality Division staff contacted the State Health Department in January of 1972, to report the disposal of large volumes of liquid industrial waste. In June of 1972, the operator was advised that humans should not consume water from the landfill well. The letter further advised that action should be taken relative to leachate control and erosion. Nevertheless, the site was relicensed without stipulation, in September of 1972. Exhibit 05.

Subsequent inspections were conducted and the license reissued. In September of 1974, however, the operator was warned about violations including spreading and compacting refuse, final cover and maintenance of cover, water pollution, and nuisance control. A hearing was held to determine the manner of correction of existing violations and for preventing further degradation of water. The memo indicated that in January of 1976, the license was reissued although the final cover had not been applied. Exhibit 05.

In February of 1976, the test results on four domestic wells indicated contamination. The operator was advised that preliminary water quality information indicated that the landfill had adversely impacted the groundwater, and would probably do the same to adjacent private wells.

In August of 1976, the county was authorized to continue using the site provided they continued to attempt to relocate. Water sampling collected in 1978 and 1979 revealed serious groundwater contamination problems. Exhibit 05.

■ Aetna maintains that the solid waste disposed at this site was initially emptied into "load luggers" or other dumptrucks and then dumped onto the ground. The process continued for years. Accordingly, Aetna concludes that the policies containing the pollution exclusion should be dismissed because the discharge of waste at the site was not sudden and accidental as a matter of law.

Upjohn disputes the conclusion in light of the Sixth Circuit's holding that it is the release of waste into the environment and not

the delivery of waste to a site that is the determinative factor in these matters. *FL Aerospace*, 897 F.2d at 220.

Here, it appears to the Court that the situation is one in which the contaminants were not placed in barrels, but placed directly into the ground. Because there was no effort to separate the contaminants from the environment, *FL Aerospace* may not be dispositive. The issue that is presented by these facts is whether the dumping of solid waste directly into a landfill precludes a finding that the pollution causing discharge was sudden and accidental. The Michigan Supreme Court has not decided this issue.

Upjohn argues that the circumstances that occurred at K–L Landfill are more closely analogous to those in *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (1991). That case involved leakage from an underground storage tank. There is caselaw from the lower court that supports Upjohn's position. In *Auto Owners Ins. Co., Home Owners Ins. Co. & Farm Bureau Mutual Ins. Co. v. City of Clare*, File No. 88–8297–CK (Cir.Ct.Cty. Clare, Nov. 6, 1992), the court reasoned that the disposal of waste into a landfill is not analogous to the spraying of pesticide. Therefore, *Protective Nat'l Ins. Co. of Omaha v. City of Woodhaven*, 438 Mich. 154, 476 N.W.2d 374 (1991), did not control the parties' dispute. The purpose of disposal of waste into a landfill was to isolate contaminants from the surrounding environment, whereas in spraying pesticide, the purpose was to release the contaminants into the environment. Because the purpose differed, the court concluded the incidents must be analyzed differently. Finally, the court found that the subsequent leakage of the materials from the landfill caused the pollution, not its initial dumping. *Id.* For all these reasons, the court concluded that the analysis started with whether the leakage of materials from the landfill was sudden and accidental.

Aetna argues that this Court should find *Protective Nat'l Ins. Co. of Omaha v. City of Woodhaven*, 438 Mich. 154, 476 N.W.2d 374 (1991), controls this issue. In that case the court found that the intentional release of pesticide spray into the air did not fall within

the sudden and accidental exception to the pollution exclusion. The court focused on the initial release into the atmosphere rather than the subsequent migration of the pesticide. *Id.*

Aetna's contention that the *Woodhaven* analysis should be applied has been adopted by at least two other courts. In *G. Heilman Brewing Co. v. Royal Group Inc.*, 779 F.Supp. 736 (S.D.N.Y.), the court held that under Michigan law, pollution caused by repeatedly dumping waste directly into "unlined earthen lagoons" was neither sudden nor accidental as a matter of law. The court clearly found that the absence of an artificial containment devise a dispositive factor in reaching this conclusion.

A similar result was reached in *County of Kent v. Home Ins. Co.*, File No. 85–46740–CK (Cir.Ct.Cty.Kent, Jan. 6, 1993). The court relied on the *Woodhaven* case because it was convinced that the factual distinction between dispersal of pesticide into the air and the placement of waste into the ground was not dispositive. In *Woodhaven,* the court made it clear that the initial discharge and not the subsequent migration was the focal point upon which its analysis was built.

This Court agrees. Under Upjohn's analysis, the focal point is first the purpose of the disposal and second the manner in which migration occurred. This Court finds that the purpose of the disposal, however laudatory, is not a dispositive factor. Nor is the movement of the waste after its introduction into the environment, be it by air, earth or water. The waste material transported to the K–L Landfill was intentionally placed into the ground. Regardless of the disposer's good intentions, the pollution creating discharge cannot be characterized as sudden and accidental. Accordingly, Aetna's motion for partial summary judgment is **GRANTED.**

### G. Pulverizing Services

▮ Pulverizing Services, Inc. was in the business of pulverizing or powdering various industrial chemicals including herbicides and pesticides. Upjohn never sent process wastes to this site for destruction and disposal. It shipped products to the facility for formulation and packaging throughout the 1960s and 1970s. Aetna moves for partial summary judgment at this site on those policies that contained the pollution exclusion.

The EPA and New Jersey Department of Environmental Protection ("NJDEP") documents indicate that the site was contaminated with every known type of pesticide and herbicide. Large areas of the site were barren and defoliated due to widespread soil contamination. Disposal practices included the landfilling of pesticide wastes on-site. Exhibit Q1.

A NJDEP memo addressing site inspection and sampling, dated July 10, 1985, indicated that the company history included routine disposal of waste materials throughout the property, floor drains contaminated from spills in the buildings, soil contamination or foreign material buried in lagoons or pits, the absence of plant growth on the property, and partial remains of buried drums, pails and plastic bags scattered across the property. Exhibit Q5.

The memo also noted that the author, after questioning the former owner of the site, Albert C. Hobbie, learned that the processing building would be washed down several times a year and that the rinse water was channeled through the floor drains into a pit along the rear of the building. The liquid in this trench was periodically pumped through a manhole into a pipe which led into a stream which also received the cooling water discharge. All of this evidence supports a finding that the discharges causing pollution were intentional and on-going.

There is some evidence, however, that at least some releases at this site may have been sudden and accidental. The affidavit testimony of Albert C. Hobbie indicated that when the facility closed, Upjohn products remained stored in three buildings. Trespassers broke into the facility and vandalized many of the containers and, according to Hobbie, but for the vandalism at the site, none of the products remaining after shutdown would have been discharged. Upjohn contends that because its materials could have been released as a consequence of vandalism and because such an event is sudden

and accidental, a question of fact is created thereby precluding summary judgment.

There is caselaw to support a finding that pollution caused by release due to vandalism falls within the sudden and accidental exception. See, *New Hampshire Ins. Co. v. H. Brown Co.*, slip op. at 10–11, Exhibit T; *American States Ins. Co. v. Maryland Cas. Co.*, 587 F.Supp. 1549, 1552 (E.D.Mich.1984). The Court concludes that in light of the Hobbie affidavit, there remain questions of fact as to the sudden and accidental nature of at least one discharge at this site. Accordingly, the Court **DENIES** summary judgment at this site.

### CONCLUSION

In accordance with the opinion issued above, the Court hereby **GRANTS in part** and **DENIES in part** Aetna's motion for summary judgment.