Cratsley, J.
Pursuant to Mass.R.Civ.P. 56, the plaintiff, Francis J. Marks (“Marks”), has moved for partial summary judgment and declaratory relief that the defendant, Lumbermens Mutual Casualty Company (“Lumbermens”), is obligated to defend him against the counterclaims asserted against him in the underlying action, Marks v. Scarpino, Middlesex County Civil Action No. 91-3376. Lumbermens opposes plaintiffs motion and cross-moves for summary judgment asserting that it has no duty to defend or indemnify Marks. For the reasons set forth below, the plaintiffs motion is ALLOWED and the defendant’s motion is DENIED.
FACTS
The Underlying Action
From 1976 until 1987 Marks owned and operated a gasoline service station (“property”) at 151 South Main Street, Cohasset, Massachusetts. On or about April 21, 1987 Marks sold the property to Francesco Scarpino (“Scarpino”) in exchange for a promissory note. On or about May 3, 1991 Scarpino allegedly removed three or four 4,000-gallon underground storage tanks from the property and discovered that there had been a release of gasoline and other hazardous materials. As a result Scarpino stopped making payments on the note. On November 25, 1991 Marks commenced an action against Scarpino for his failure to make payments, and on December 16, 1991 Scarpino counterclaimed against Marks.
Scarpino alleges that in 1978 the underground gas tanks began releasing gasoline and hazardous materials on the property, due to improper installation of the tanks, the vapor recovery manifold and piping. Scarpino alleges that the release was discovered when Marks installed an underground diesel tank on the property in 1981. In November or December, 1981 the Massachusetts Department of Environmental Protection (“DEP”) investigated the property as the potential source of oil contamination of a nearby brook, and determined that the oil in the brook had originated from the location of the property. Scarpino’s First Amended Counterclaim, ¶13.
In May 1986 and April 1987 Marks had the site inspected and tested for the presence of oil and hazardous materials by John Carr Associates, Inc. No evidence of hazardous wastes or toxic substances was found on the site. Plaintiffs Exhibits 2, 3.
On September 26, 1991 the DEP sent Scarpino a Notice of Responsibility (“NOR”) concerning contamination at the property. The NOR stated that “[t]he Department is particularly sensitive to this release due to the proximity of the site to the Town of Cohasset’s Elms Meadow well.” (See Exhibit 8.) The DEP required Scarpino to perform a Phase I Limited Site Investigation, which included an installation of groundwater monitoring wells to determine the direction of groundwater flow and any possible offsite migration of contamination. Scarpino asserts that Marks is responsible for the contamination under Massachusetts General Laws Chapter 2IE.
In November 1992 Groundwater Technology, Inc. (“GTI”) conducted the Phase I Report. In its report, GTI stated that “(b)ased on field reconnaissance, several *179 residential buildings surrounding the subject site have basements that are potential receptors of gasoline-related vapors emanating from the subject site. The permeable backfill surrounding underground utilities is a possible preferential pathway for the migration of gasoline related volatile organic compounds.”[1] In the Short Term Measure Evaluation section, GTI stated that petroleum vapors had already been detected in the catch basins in the vicinity of the site.
On November 11, 1993 Marks sent Lumbermens written notice of Scarpino’s claims in the underlying action, and requested that Lumbermens defend and agree to indemnify him against those claims. Lumbermens denied plaintiffs request on February 9, 1994 based on, inter alia, the owned property exclusion, the alienated property exclusion, and Marks’ alleged failure to give timely notice of the occurrence to Lumbermens. This separate declaratory judgment action ensued.
The Policies:
From 1978 through 1987 Lumbermens continuously insured Marks under Massachusetts Motor Vehicle— Garage Liability Form Policies (“policies”), in which Part II — Coverage C — Property Damage Liability provides:
the company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which Part II applies, caused by accident and arising out of the hazards described below; and the company shall have the right and duty to defend any suit against the insured seeking damages payable under the terms of this policy, even if any of the allegations of the suit are groundless, false, or fraudulent...
One of the hazards described immediately thereafter is the Garage Operation Hazard, defined as:
The ownership, maintenance or use of the premises for the purposes of a garage, and all operations necessary or incidental thereto, [are] called “garage operations.”
Marks’ policies state that they do not apply to damage to property owned by the insured, rented to or held for sale by the insured, or alienated by the insured.[2]
DISCUSSION
Pursuant to Mass.R.Civ.P. 56, summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The movant has the burden of proving the absence of a triable issue and that it is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Community Nat’l Bank v. Dawes, 369 Mass. 550, 554 (1976). The burden on the moving party may be discharged by showing that there is an absence of evidence to support the non-moving party’s case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the movant has met its burden, the burden shifts to the non-moving party to show with admissible evidence the existence of a dispute as to some material fact. Godbout v. Cousens, 396 Mass. 254, 261 (1985).
An insurer must defend its insured if there is any realistic possibility of coverage for the underlying claims. An insurance company’s duly to defend is broader than its duty to indemnify. Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10 (1989). The question of the duty of an insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions. Liberty Mutual Ins. Co. v. SCA Services, Inc., 412 Mass. 330, 331-32. If the allegations of the complaint are ‘reasonably susceptible’ of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense. Id.
Interpretation of the language of an exclusion to an insurance policy presents a question of law. Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass.App.Ct. 318, 323 (1991). Interpretation of an exclusion is guided by three principles. First, like other contracts, an insurance policy is to be construed according to the fair and reasonable meaning of its words. Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982). Second, exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured. Vappi & Co. v. Aetna Cas. & Sur. Co., 348 Mass. 427, 431-32 (1965). Third, doubts created by any ambiguous words or provisions are to be resolved against the insurer. Bates v. John Hancock Mutual Life Ins. Co., 6 Mass.App.Ct. 823 (1978).
In order to grant defendant’s cross-motion for summary judgment, this Court would have to find as a matter of law that there is no possible factual or legal basis on which Lumbermens might, eventually be held obligated to indemnify Marks under its policies. See W.R. Grace & Co. v. Maryland Casualty Co., 33 Mass.App.Ct. 358, 364 (1992). This cannot be done. Because this Court finds that the allegations of the underlying complaint are ‘reasonably susceptible’ of an interpretation that they state or adumbrate a claim covered by the policy terms, see Liberty Mutual Ins. Co., 412 Mass. 330, 331-32, plaintiffs motion for partial summary judgment is granted.
In Massachusetts, the owned property exclusion does not bar coverage for the cleanup of contamination on an insured’s property to prevent greater harm to third parties off-site. See Allstate Ins. Co. v. Quinn Constr. Co., 713 F.Supp. 35 (D. Mass. 1989). If environmental contamination presents a demonstrated danger to the property of another, the owned property exclusion cannot relieve an insurance company of their duty to defend. See id. at 41 (“In the unique context of environmental contamination, where prevention can be far more economical than post-incident *180 cure, it serves no legitimate purpose to assert that soil and groundwater pollution must be allowed to spread over property lines before it can be said to have caused the damage to other people’s property which liability insurance is intended to indemnify”).
Here, the DEP has expressed its concern with oil detected near the property and with off-site migration of the contamination. In November or December 1981, it is alleged that the DEP determined that the property was the source of oil contamination of a nearby brook. Scarpino’s First Amended Counterclaim, 113.
Further, Scarpino alleges that he has undertaken containment action regarding the release of oil and hazardous material on the property, and claims that Marks is liable to him for the reasonable costs of containment and other damages. (Exhibit 7,143, 44.)
In identifying potential receptors and migration pathways of the contamination, GTI stated that several surrounding residential buildings have basements that are potential receptors of gasoline-related vapors emanating from the subject site, and that the permeable backfill surrounding underground utilities is a possible pathway for the migration of the contamination.[3] In the Short Term Measure Evaluation section, GTI stated that petroleum vapors had already been detected in the catch basins in the vicinity of the site. Thus, the Phase I Report lends support to this Court’s finding that off-site damages will more likely than not surface in the underlying suit.
In the record there are also allegations that contamination from the property has spread to groundwater. During the removal of the three or four 4,000 gallon gasoline underground storage tanks in May 1991 liquid-phase petroleum hydrocarbons were detected in the excavation pit floating on the groundwater.[4] Further, after sampling the groundwater monitoring wells, laboratory analysis indicated the presence of up to 12,5000 ug/1 total BTEX.[5]
The owned property exclusion will not bar coverage of cleanup costs undertaken on plaintiffs property where there is actual or threatened damage to groundwater beneath the insured’s property. United Technologies Corp. v. Liberty Mutual Ins. Co., C.A. No. 87-7172, 1 Mass. L. Rptr. 91 (Suffolk Superior Court, 1993) (Murphy, J.) (“[I]t is not likely that the Massachusetts appellate courts would apply the owned-properfy exclusion to contaminated groundwater”). In Atlas Tack Corp. v. Commercial Union Ins. Co., C.A. Nos. 91-5666, 91-5667, 91-5669 (Suffolk Superior Court, 1993) (Zobel, J.), this Court recognized that other jurisdictions have held owned-property exclusions inapplicable where pollution affects groundwater.[6] One United States Court of Appeals has even held that improper release of toxic waste may constitute “property damage” to state and federal governments because of their interest in all the earth and air within their domain. Atlas Tack at 13, citing Continental Ins. Cos. v. Northeastern Pharmaceutical and Chemical Co., Inc., 811 F.2d 1180, 1187 (8th Cir. 1987). A reading of Atlas Tack and United Technologies shows that the longstanding rule in Massachusetts of absolute ownership of groundwater is being closely reexamined in cases pertaining to hazardous contamination. See Gamer v. Town of Milton, 346 Mass. 617, 620 (1964) (finding land owner has absolute ownership of subsurface percolating water).[7]
Irrespective of the determination of the ownership of groundwater, however, Scarpino’s counterclaim and the representations made by the DEP establish a clear threat that the alleged contamination will, or did in the past, migrate off the property and that the underlying suit will involve issues related to liabilify for off-site clean up.
Lumbermens cites Travelers Ins. Co. v. Waltham Indus. Lab. Corp., 722 F.Supp. 814 (1988), for the proposition that an owned property exclusion applies where remedial activities focus solely on damage confined to the insured’s property and do not purport to prevent off-site contamination. That case is not instructive here. First, as seen above, Scarpino’s remedial activities and potential liabilities are not confined to the property. Second, in Waltham, the insurance policy in question contained a pollution exclusion which does not exist in this case.
Next, Lumbermens cites Judge Zobel’s opinion in Atlas Tack for the proposition that the owned property exclusion bars coverage for environmental remediation to property owned by the insured. C.A. Nos. 91-5666, 91-5667, 91-5669, slip op. (1993). In Atlas, summary judgment was entered for five insurance companies where the insured discharged hazardous wastes and pollutants into a lagoon and Buzzards Bay. But in that case there was a pollution exclusion clause in each of the insured’s policies, thereby precluding coverage for all pollution damage unless sudden and accidental. In contrast, as stated above, no such exclusion exists in this case.
While it is true that Scarpino’s counterclaim mainly references damages to or on his property, a fair reading of the counterclaim, the move toward a recognition of the public nature of groundwater as outlined in Atlas Tack, and the language of the NOR and the GTt Phase I Report all describe damages which plaintiffs insurance policy is ‘reasonably susceptible’ of covering.[8]
Lumbermens asserts that Marks did not give Lumbermens notice of the Scarpino counterclaim “as soon as practicable” as set forth in the general conditions of the policy, and that Lumbermens was prejudiced by this late notice. Lumbermens seeks to demonstrate prejudice by stating that “[t]he tanks on the properly had been disposed of and the condition of the property had been altered so significantly that it was impossible to ascertain the condition of the property at the time of the initial claim.” Defendant’s first memorandum, p. 19.
Scarpino had removed the gasoline tanks in May 1991, six months before Marks filed the initial suit for non-payment of the note, and seven months before Scarpino filed his counterclaim against Marks. Even *181 instantaneous notice to Lumbermens of Scarpino’s counterclaim would not have afforded it an appreciably greater opportunity than it actually had to investigate and ascertain the condition of the property at the time the counterclaim was filed.[9]
ORDER
For the forgoing reasons, it is hereby ORDERED that plaintiffs motion for partial summary judgment is ALLOWED. It is further ORDERED that defendant’s cross-motion for summary judgment is DENIED.

potential Receptors and Migration Pathways, Limited Site Investigation Report, 10/27/93.

See Jacket, Page 5 (LMC 0315). The provision cited here is on the jacket for the 1979-1980 policy. Each of the jackets produced by Lumbermens for the other policy years is identical.

GTI Phase I — Limited Site Investigation Report, submitted on 10/27/93.

GTI Phase I Report, p. 24; 2 IE Report on Tank Removal Observation & Soil Testing.

BTEX is the sum of benzene, toluene, ethylbenzene and total xylenes.

United States v. Conservation Chemical Co., 653 F.Supp 152, 200 (W.D.Mo. 1986); Polkow v. Citizens Ins. Co. of America, 180 Mich.App. 651, 659 (1989) reversed on other grounds, 438 Mich. 197,201 (1991); Upjohn Co. v. New Hampshire Ins. Co., 178 Mich.App. 706, 719-20 (1989) reversed on other grounds, 438 Mich. 197, 201 (1991).

Noteworthy is that Gamer, 346 Mass, at 195 did not relate to the issue of pollution containment. That case was decided over thirty years ago, before many current understandings of environmental interdependence had surfaced.

lumbermens asserts that the alienated property exclusion of the policies also bars coverage “for the same reasons discussed in this analysis.” Motion for Summary Judgment, p.8, note 3. Because this Court is unpersuaded by these reasons, this argument too must fail.

Here, Marks notified Lumbermens slightly less than two years after being served with Scarpino’s counterclaim. While one may query as to why Marks did not notify Lumbermens sooner, this Court is not disposed to deny a defense based on allegations of knowledge before the counterclaim was filed. See Darcy v. Hartford Ins. Co.; Royal Globe Ins. Co., 407 Mass. 481, 487 (refusal to find forfeiture of insurance coverage despite five-year delay in notification). Furthermore, Lumbermens has shown no prejudice by the delay in notice.