NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0290n.06

Case No. 24-1921

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 10, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| FIVES ST CORP., | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| ALLIED WORLD SURPLUS LINES | ) | MICHIGAN |
| INSURANCE COMPANY, | ) | |
| | ) | OPINION |
|     Defendant-Appellee. | ) | |

Before: THAPAR, READLER, and BLOOMEKATZ, Circuit Judges.

THAPAR, Circuit Judge. This case presents a simple question: Did Fives ST have knowledge of an existing dispute when it signed its insurance policy? It did, so we affirm the district court's grant of summary judgment.

I.

Fives ST Corporation ("FST") designs and supplies machines, equipment, and other technology for assembly lines. In 2018, FST signed an Equipment Purchasing Agreement with PolyVision, a company that manufactures ceramic steel surfaces such as chalkboards and whiteboards. Under this agreement, FST agreed to supply PolyVision with parts for one of its lines.

Things didn't go as planned. FST was consistently late in delivering equipment. So, in February 2020, PolyVision served FST with a demand for liquidated damages. The next month,

PolyVision sent FST another letter, alleging that FST had failed to "perform[] its work to the best of its ability and according to the terms of [their] agreement." R. 25-4, Pg. ID 393. Soon, the parties negotiated a settlement in which FST agreed to pay PolyVision one hundred thousand euros and provide on-site services. FST also agreed to 30 days of remote services in return for "late or defective performance." R. 25-7, Pg. ID 403.[1]

PolyVision, however, still believed that FST wasn't living up to its obligations. In August 2021, PolyVision wrote to FST alleging, among other things, that FST's design failures had forced them to bear considerable costs. FST replied by insisting that the "design . . . is not flawed." R. 25-9, Pg. ID 416.

The dispute continued. In October, FST agreed to send a "steering specialist" to PolyVision to "review the operation and performance" of FST equipment. Balcer Dep. at 2, *PolyVision Corp. v. Fives ST Corp.* ("*Fives ST I*"), No. 22-cv-00150 (E.D. Okla. 2023), ECF No. 83-26. That specialist, however, had already been to the PolyVision site a few months before and concluded the equipment wasn't functioning appropriately because of a "design issue." *Id.*

While FST and PolyVision were going back and forth, FST applied for professional-services liability insurance from Allied World Surplus Lines Insurance Company. That insurance would cover the services FST offered—that is, design and construction of assembly lines like the one FST installed for PolyVision. As part of the application, FST had to fill out a questionnaire. The questionnaire asked if any officers or employees at FST had "knowledge of any act, error or omission, unresolved job dispute (including fee disputes), accident or any other circumstance that is or could be the basis for a claim under this proposed insurance policy." R. 25-10, Pg. ID 422.

---

[1] Because the parties settled at the height of the COVID-19 pandemic in spring 2020, FST specialists could not travel to PolyVision's facility in Oklahoma. Thus, FST agreed to provide remote services to PolyVision.

In bolded language and all-caps, the application stated that "it is understood and agreed that if such knowledge or information exists, any claim arising therefrom is excluded from this insurance." *Id.* FST originally left that question blank but, when pressed by Allied World, FST answered "no." R. 25-14, Pg. ID 440. Allied World then issued FST professional-services liability insurance.

Meanwhile, FST and PolyVision's dispute escalated. In internal emails, FST employees referred to the "poor excuse of the design" of their system. Sequeira Dep. at 2, *Fives ST I*, ECF No. 83-28. And they told the FST president about the "design problem" at the PolyVision facility. Balcer Dep. at 2, *Fives ST I*, ECF No. 83-29. In January 2022, PolyVision demanded that FST remove all employees from the facility and sent a demand letter alleging "abysmal" performance and claiming over $14 million in damages. R. 25-11, Pg. ID 427–28. Then, in April, PolyVision sued FST in Oklahoma, alleging that FST breached its obligations in "mis-designing the equipment, failing to own up to its design failure, and continuously stringing PolyVision along with missed deadlines, false promises, and partial fixes." R. 25-15, Pg. ID 445.

While the Oklahoma litigation was ongoing, FST filed this lawsuit seeking defense and indemnification under its Allied World policy. Allied World moved for summary judgment, which the district court granted. The district court held that FST knew about circumstances that could give rise to a claim under the policy—namely, the PolyVision dispute—so FST couldn't claim coverage. FST appealed.

## II.

### A.

Did FST have knowledge of its ongoing dispute with PolyVision when it applied for the Allied World policy? To answer that question, we look to Michigan law, which requires courts to

enforce the plain language of insurance policies. *Upjohn Co. v. N.H. Ins. Co.*, 476 N.W.2d 392, 397 (Mich. 1991).

B.

1.

FST can't succeed on appeal. Why? Its insurance policy excluded coverage for any dispute that FST had knowledge of when it applied for coverage. And here, FST had knowledge of the PolyVision dispute.

Under the insurance contract, Allied World agreed to indemnify FST for any "Claim" "arising out of a Wrongful Act in the rendering or failure to render Professional Services." R. 25-1, Pg. ID 314. The policy then defined "Professional Services" as services that the insured is qualified to perform and "are performed for others, in the Insured's capacity as" a "Construction Manager." *Id.* at Pg. ID 324. A "Construction Manager," in turn, was defined as a "person or organization that provides professional consulting services to a project owner to assist the project owner in the oversight of a project and to monitor the progress of the design and construction process." *Id.* at Pg. ID 321.

And, to get coverage, FST had to meet two conditions. First, the "Wrongful Act" needed to take place between December 29, 2003, and December 31, 2022. Second, and more importantly, before the policy became effective, no officer of the insured could have "knowledge of the actual or alleged Wrongful Act or circumstance that reasonably could give rise to a Claim under this Policy." *Id.* at Pg. ID 314.

Putting all the pieces together, FST agreed when it applied for insurance that it didn't know about any disputes that could relate to its professional services. But FST did know about potential design-defect claims arising out of its PolyVision assembly line. Over a year before FST applied

for insurance, PolyVision sent FST multiple letters alleging late deliveries and poor performance. While the parties had negotiated a settlement, PolyVision still found defects with FST's performance. PolyVision emailed FST a list of issues. As to one piece of equipment, the "stacker control system," PolyVision had to "completely rebuild" it. R. 25-8, Pg. ID 409. To PolyVision, that need "highlight[ed] the design failure and considerable cost borne by Polyvision." *Id.* FST replied by insisting that the "design of the control system is not flawed." R. 25-9, Pg. ID 416. But an expert had told the FST president that the difficulties on PolyVision's assembly line were "more of a design issue." Balcer Dep. at 2, *Fives ST I*, ECF No. 83-26. These design and assembly issues fell at the heart of FST's role as a "construction manager" that provided professional services. *See* R. 25-1, Pg. ID 321, 324. Thus, FST knew about an "act, error or omission, unresolved job dispute . . . or any other circumstance that is or could be the basis for a claim" under the policy. R. 25-10, Pg. ID 422.

2.

FST's arguments to the contrary fail.

Its central argument is that PolyVision's communications before FST applied for insurance were run-of-the-mill business and contractual disputes around the timing of delivery. But the record shows that design failures played a role in FST's dispute with PolyVision. Indeed, PolyVision warned FST about the "design failure" of the stacker device. R. 25-8, Pg. ID 409. FST's own specialist also advised the company of a "design issue." Balcer Dep. at 2, *Fives ST I*, ECF No. 83-26. And FST itself recognized that the dispute centered on the design when it insisted that the "design of the control system is not flawed." R. 25-9, Pg. ID 416. Thus, at the time that FST applied for coverage, the company knew about design failures that amounted to a

"circumstance" that was or "could be" the basis for a claim under the policy. R. 25-10, Pg. ID 422.

FST also argues that PolyVision's alleged design defect related to a component part designed by one of FST's subcontractors. But FST, not its subcontractor, was contractually responsible for supplying the relevant equipment. So, as far as PolyVision was concerned, FST was responsible for the defects—as is evident from PolyVision's complaint against FST.

Finally, FST argues that insurers aren't usually allowed to deny coverage just because the policy took effect after the circumstances giving rise to the claims. *See Mich. Millers Mut. Ins. Co. v. Fid. & Deposit Co. of Md.*, 809 F. Supp. 2d 703, 711 (W.D. Mich. 2011); *Alticor Glob. Holdings Inc. v. Am. Int'l Specialty Lines Ins. Co.*, No. 22-1631, 2024 WL 3912697, at *4–5 (6th Cir. Aug. 23, 2024). That's true, but inapposite. Why? FST's knowledge of the ongoing or potential claims means that there's no coverage at all.

Thus, we affirm.